**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 7 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KEVIN LEE BIGLOW,

     Plaintiff - Appellant,

and

HENRY F. BUTLER,

     Plaintiff,

v.

THE BOEING COMPANY,

     Defendant - Appellee.

No. 02-3001
(D.C. No. 00-CV-2370-KHV)
(D. Kansas)

---

**ORDER AND JUDGMENT**[*]

---

Before **SEYMOUR**, **EBEL** and **BRISCOE**, Circuit Judges.

Plaintiff Kevin Lee Biglow appeals from the district court's grant of summary

judgment in favor of defendant The Boeing Company (Boeing) on his race-based

discriminatory pay claim brought under 42 U.S.C. § 1981. We exercise jurisdiction

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

pursuant to 28 U.S.C. § 1291 and affirm.

## I.

Boeing, a manufacturer of airplanes, missiles, and space and communications systems, maintains engineering, fabrication, and assembly facilities in Wichita, Kansas. Boeing's Wichita facilities encompass four divisions: (1) Boeing Commercial Airplane Group (Commercial); (2) Wichita Military Modification Center (Military); (3) Boeing Airplane Services; and (4) Shared Services Group (Shared Services). The Shared Services division provides computer and information support services to the other three Wichita divisions.

Biglow, an African-American male, is a high school graduate who has been employed by Boeing at its Wichita facilities since 1989. Throughout his career at Boeing, Biglow has worked in the Shared Services division and has held various positions detailed below.

*Boeing's payroll classification system*

In early 1993, Boeing implemented the "New Salaried Payroll" (NSP), a payroll classification system. The NSP utilized "specialty descriptions," which were the equivalent of "job families." Each specialty description consisted of two components: (1) a specialty summary; and (2) various level descriptions/specialty levels. The specialty summary provided an overview of all level descriptions that fell within the summary.

2

The level descriptions/specialty levels set forth in detail the work performed, the expected results, suggested methods for achieving those results, and the preferred qualifications for each level or grade. Each level description/specialty level was also associated with a pay grade, and each pay grade was linked to a specific salary range, including a minimum annual salary. An employee could not be classified at a particular grade level without being afforded the minimum annual salary associated with that grade level. At issue in this case is a specialty referred to by Boeing as "system configuration specialist." From 1994 to 1998, the specialty of system configuration specialist encompassed three specialty levels (1, 2 and 3) and three corresponding pay grades (46, 48 and 51).

*Salary planning under the NSP*

Under the NSP, Boeing's corporate management determined the total amount of funds to be allocated for annual salary-planning activities including selective salary adjustments, lump sum awards, and promotions/reclassifications. These funds were referred to as the "selective salary adjustment fund," otherwise known as the "SELA fund" or "merit fund." Each division at Wichita had its own SELA fund. In turn, each division's SELA fund was allocated by the division manager to the individual line managers in proportion to the total payrolls of the employees they managed. Thus, each line manager effectively had his or her own SELA fund from which he or she allocated annual salary adjustments, lump sum awards, and promotions to his or her employees.

3

Gerry Johnson was the vice-president and general manager of the Shared Services division. Although Johnson had authority to do so, he chose not to hold back any SELA money in a contingency fund or carry any SELA money over from year to year. Instead, it was Johnson's practice to release all of Shared Services' SELA money to the division's line managers and allow them to spend it as they determined. The only contingency fund that existed within Shared Services consisted of SELA money that was not spent by line management. A line manager within Shared Services could request money from the contingency fund to distribute more in salary adjustments than was available within the line manager's SELA fund. These special requests for money from the contingency fund were made to a designated team of three to five second-level managers.

After the line managers completed their annual salary adjustment plans (and, when necessary, received approval from second-level management), the plans were forwarded to Boeing's human resources department. The plans were entered into the company's performance review and salary adjustment database and various reports were generated. The plans were reviewed by the compensation department to ensure that the line managers did not exceed their budgeted SELA funds and that there were no statistical disparities with respect to female or minority employees.

*Plaintiff's employment history at Boeing*

When he began his employment in April 1989, plaintiff was assigned to Boeing's

data center as an operator 1 data processor at an annual salary of $11,700. In December 1991, he was promoted to the position of analyst 3 supporting the Commercial division (equivalent to what the NSP system later described as a systems configuration specialist). In July 1992, Boeing reduced its Wichita work force. To avoid laying off plaintiff, Boeing demoted him to an operator 3 data processor.

In June 1994, plaintiff applied for two available systems configuration specialist positions supporting the Commercial division. Although plaintiff was one of three finalists, he was not selected for either position. Instead, the positions were filled by Randy Bellew and Kim Zehr, both Caucasian employees.

In October 1994, plaintiff applied for and was promoted to a systems configuration specialist position supporting the Military division. Cecil Gardner, an African-American male, interviewed plaintiff for the position and became his immediate supervisor. Plaintiff began work at salary grade 48 (the middle salary grade for systems configuration specialists) with a salary of $24,100. Although Gardner initially planned for plaintiff to work at salary grade 48 for six months and then move to salary grade 51 (the highest salary grade for systems configuration specialists), in February 1995 he recommended that plaintiff be moved to salary grade 51 based upon his work performance. Gardner was informed by Warren Korphage, a human resources employee, that the recommended salary increase (approximately $9,500) would come out of Gardner's annual SELA fund. Gardner concluded he could not give plaintiff the raise he initially recommended because

5

it would reduce the amount of 1995 SELA funds available for his other employees. However, because Gardner believed that plaintiff was performing salary grade 51 work, he developed a plan to increase plaintiff to that corresponding grade over the course of several years.

Between 1995 and 1998, Gardner gave plaintiff annual raises. In the 1995 salary planning exercise, Gardner gave plaintiff a $2,500 raise, increasing his salary from $24,100 to $26,600 (a 10.4% increase), effective August 18, 1995. In the 1996 salary planning exercise, Gardner gave plaintiff a $1,350 raise, increasing his salary from $26,600 to $27,950 (a 5.1% increase), effective April 12, 1996. After the 1996 salary planning exercise was complete, Gardner requested and was given an additional $1,000 for plaintiff, effective July 5, 1996. In the 1997 salary planning exercise, Gardner gave plaintiff a $1,400 raise, increasing his salary from $28,950 to $30,350 (an 8.6% increase), effective April 11, 1997. In the 1998 salary planning exercise, Gardner planned to give plaintiff a $1,850 raise, increasing his salary from $30,350 to $32,200 (a 6.1% increase).

*Salary increases of system configuration specialists supporting Commercial division*

During the time period that plaintiff worked as a system configuration specialist supporting the Military division, there were four Caucasian employees working as system configuration specialists supporting the Commercial division (Randy Bellew, Kim Zehr, Jeff Martin, and Jeff Lyon). The four employees had a different first-level manager, were

6

in a different salary-planning group, and were in a different physical location than plaintiff. However, they were all employees of the Shared Services division with the same general manager (Gerry Johnson).

As previously noted, Bellew and Zehr were promoted to their positions as system configuration specialists in June 1994, at salary grades of 48 and salaries of $25,900. In October 1994, Bellew received a merit increase to $26,750, and Zehr received a merit increase to $26,400. In 1995, Bellew received a merit increase to $28,000, and Zehr received a merit increase to $27,650. In April 1996, Bellew received a merit increase to $31,800, and Zehr received a merit increase to $33,600. In July 1996, Bellew received a merit increase to $33,600. In February 1997, Bellew was promoted to salary grade 51 and received a salary increase to $36,200. In April 1997, Zehr received a merit increase to $35,100. In October 1997, Zehr was promoted to salary grade 51 and received a pay increase to $36,200. Bellew and Zehr were promoted with SELA funds allocated to their respective first-line managers.

Jeff Lyon and Jeff Martin were promoted to their positions as system configuration specialists in 1996. Lyon began at salary grade 46 and a salary of $25,400. Martin began at salary grade 48 and a salary of $28,200. In the April 1997 salary planning exercise, Lyon's salary was increased to $26,700, and Martin's salary was increased to $29,450.

On July 28, 1997, Lyon sent an e-mail message to Jeff Turner, the general manager of the Commercial division, complaining that he was performing salary grade 51 work

7

without being properly compensated. A copy of Lyon's message was forwarded to Lyon's first-line manager, Laura Ringle, who prepared a proposed plan for boosting Lyon to salary grade 51. Under Ringle's proposed plan, Lyon would continue performing grade 51 work but would be classified and paid at salary grade 48 for a period of seven years, during which time his managers would try to raise him to salary grade 51 by using SELA fund money and any leftover contingency fund money.

In October 1997, Lyon personally met with Gerry Johnson and informed him that he (Lyon) and Martin were performing salary grade 51 work, but were not being properly compensated. After the meeting, Johnson reviewed Ringle's proposed plan for boosting Lyon to salary grade 51 and concluded it was not "logical," particularly because it required Lyon to work outside his true grade for a long period of time. After confirming with the human resources department that Lyon and Martin were performing salary grade 51 work, and determining there were not enough SELA funds within Lyon's and Martin's salary-planning group to correct the problem, Johnson concluded the only option was to move Lyon and Martin to lower-graded work consistent with their compensation. Accordingly, in October 1997, Lyon and Martin were moved to different areas where they could perform salary grade 48 work. At the same time, Lyon received a $1,000 pay raise to bring his pay to the salary grade 48 minimum. Zehr's salary was increased by $1,100 so he could be reclassified from salary grade 48 to 51 and continue to perform salary grade 51 work. Both salary increases were charged to their first-line managers' 1998

SELA funds.

On October 29, 1997, Martin sent a letter to Turner, with a copy to Johnson, complaining about the reduction in his job responsibilities. Approximately one to two weeks after receiving the letter, Johnson personally met with Martin to discuss the situation. Johnson informed Martin that he was not the only person being underpaid for the work he was performing. Johnson told Martin to be patient because he (Johnson) was going to meet with Boeing's corporate personnel to try to obtain additional funding for promotions.

In January 1998, Boeing altered the manner for funding promotions under the NSP system. Specifically, any promotions occurring after February 12, 1998, were to be charged to a new "promotion fund" rather than to the SELA funds. The promotion fund, unlike the SELA funds, was not specifically limited in amount. However, Boeing's corporate compensation personnel instructed the Wichita compensation personnel to be judicious with the promotion fund and instructed that the amount spent on promotions each year should not exceed 0.8% of total payroll.

Shortly after the promotion fund was created, Johnson contacted the Wichita human resources department and instructed them, if possible, to return Lyon and Martin to their positions performing salary grade 51 work. Accordingly, on February 27, 1998, Lyon and Martin were promoted to salary grade 51, given pay raises to the salary grade 51 minimum of $37,500, and returned to their previous work responsibilities. Their raises

9

were funded by out-of-sequence SELA fund money charged to their manager's 1998 SELA fund ($1,250 for Lyon and $1,350 for Martin), combined with money from the new promotion fund ($8,250 for Lyon and $6,700 for Martin). Neither Lyon nor Martin received any additional money during the April 1998 salary planning exercise.

*Plaintiff's discovery of 1998 raises for Lyon and Martin*

During the 1998 salary planning exercises, Gardner contacted his second-level manager, Armond Friend, and asked for $7,150 from the promotion fund to bring plaintiff up to the salary grade 51 minimum of $37,500. Gardner also proposed giving plaintiff additional money taken from Gardner's SELA fund to boost plaintiff's salary to $39,350. Friend expressed concern about immediately taking a large sum from the promotion fund, and asked Gardner to wait until November 1998 to increase plaintiff's salary. Gardner and Friend agreed to give plaintiff $300 from leftover SELA contingency funds.

When informed by Gardner of Friend's response, plaintiff expressed dissatisfaction. Plaintiff became more dissatisfied when he learned, by chance through a telephone conversation with Lyon, that Lyon and Martin had been upgraded to salary grade 51. Plaintiff expressed his unhappiness to Gardner, who in turn telephoned human resources representative Warren Korphage to determine whether the information was true. Korphage confirmed the information was true, stating (in a conversation overheard by plaintiff): "Goddamn, Cecil, those guys [Lyon and Martin] were told to keep their

10

f***ing mouths shut. Yes, it's true."[1] App. at 175. Gardner responded: "I hope you know that [plaintiff] can file a f***ing discrimination lawsuit against you all's asses." Id. Korphage acknowledged that possibility, stating: "Yes, I know." Id.

On March 26, 1998, plaintiff sent an e-mail message to Johnson complaining of Gardner's inability to promote him to salary grade 51, particularly in light of the promotions received by Lyon and Martin. Johnson, who previously had been unaware of plaintiff's salary situation, contacted Korphage and asked him to evaluate plaintiff's complaint. Johnson also discussed the matter with Friend (Gardner's supervisor).

On April 6, 1998, plaintiff met with Gardner, Friend, Korphage, and one of Korphage's assistants, and reiterated his complaints. Friend told plaintiff they had two options: move plaintiff to a lesser job commensurate with his current salary or increase plaintiff to salary grade 51. Plaintiff asked Korphage about the recent raises given to Lyon and Martin. Korphage declined to comment, other than to state that those raises had involved "special circumstances" he was not free to discuss. Plaintiff responded by stating he felt he was being subjected to racial discrimination.

On or about April 14, 1998, Johnson approved a recommendation by Korphage and other human resources personnel to raise plaintiff's salary to the grade 51 minimum

---

[1] In his deposition, Korphage denied making that exact statement. He testified that he "would have said something to the effect of . . . 'Why are they talking about that. You know, they are not supposed to be talking about salary to' – you know, 'telling salaries to other people.'" App. at 220.

11

of $37,500, retroactive to February 27, 1998 (the date of Lyon's and Martin's raises), plus an additional $1,850 from Gardner's SELA fund, bringing plaintiff's total salary to $39,350 (from $30,350). Plaintiff was not satisfied with the proposed raise, however, and met with Johnson, Friend, Gardner, and others in an effort to make the proposed pay increase retroactive to October 1994, the date he began work as a systems configuration specialist under Gardner. That request was denied. Since his 1998 promotion, plaintiff has continued to be paid more than Bellew, Zehr, and Martin.[2] For example, by year 2001, plaintiff's salary had been increased to $47,850. In contrast, Bellew's salary was $44,650, Zehr's salary was $44,750, and Martin's salary was $43,200.

*Procedural history*

Plaintiff filed suit against Boeing on August 14, 2000, asserting, in pertinent part, a claim of racial discrimination under 42 U.S.C. § 1981 based on Boeing paying him less than Caucasian co-workers performing the same job functions from late 1994 to April 1998.[3] The district court granted Boeing's motion for summary judgment with respect to

___

[2] Lyon quit his job in June 1999.

[3] Plaintiff asserted two additional § 1981 claims, one based on Boeing's failure to promote him to a system configuration specialist 2 position in June 1994, and another based upon Boeing's alleged retaliation against him for complaining about racial discrimination. Plaintiff also asserted claims under 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, and the Kansas Acts Against Discrimination, Kan. Stat. Ann. § 44-1001 et seq. All of these claims were dismissed and are not at issue in this appeal.

the § 1981 claim.

II.

We review de novo the district court's grant of summary judgment in favor of defendant Boeing. Cooperman v. David, 214 F.3d 1162, 1164 (10th Cir. 2000). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

III.

*Direct evidence of discrimination*

Plaintiff contends that, in granting summary judgment in favor of Boeing, the district court overlooked what he describes as "direct evidence" of discrimination. More specifically, plaintiff contends that the statements made by Korphage to Gardner during their phone conversation in mid-March 1998 directly reflected the discriminatory attitude of Boeing and, at the very least, "constitute[d] evidence from which a jury could draw an inference that Boeing had 'concealed motives' concerning the pay raises given to" Martin and Lyon. Opening Br. at 22.

There are two major problems with plaintiff's arguments. Although Boeing argues plaintiff failed to raise these specific arguments in the district court, plaintiff did quote Korphage's statements in his response to Boeing's motion for summary judgment when

13

addressing whether race was a motivating factor in the pay disparity alleged. However, it is clear that Korphage's statements to Gardner do not constitute direct evidence of discrimination. By stating that Martin and Lyon were supposed to "keep their mouths shut," and by agreeing with Gardner that plaintiff could file a lawsuit against Boeing, Korphage was not necessarily admitting that plaintiff had been paid less than other Boeing employees because of his race. See Danville v. Regional Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002) ("Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons."). Further, while it is questionable whether plaintiff relied on Korphage's statements to establish pretext in his response to Boeing's motion for summary judgment, Korphage's statements are not sufficient to create a genuine issue of material fact with regard to the issue of pretext. Korphage's statements pertained only to the raises given in February 1998 to Martin and Lyon. Having reviewed the record on appeal, we conclude that plaintiff has failed to establish that Martin and Lyon were treated more favorably than him with respect to pay.[4]

_____

[4] We agree with the district court's analysis on this point:

> Until February 27, 1998, plaintiff earned more than either Lyon or Martin. In addition, although plaintiff received his promotion to grade 51 at a later date, defendant implemented it retroactively to February 27, 1998, the date on which Lyon and Martin had received their promotions. Perhaps plaintiff could argue that defendant treated him less favorably between October 1997 and February 27, 1998, when it demoted Martin and Lyon to lower grade job responsibilities while plaintiff continued to perform grade 51 level work – but plaintiff does not do so.

App. at 435 n.24.

14

Korphage's statements are irrelevant to whether Boeing's stated reasons for paying Bellew and Zehr more than plaintiff were pretextual.

*Evidence of pretext*

Plaintiff contends the district court erred in concluding that he failed to present sufficient evidence to create a genuine issue of material fact regarding whether Boeing's stated reason for the pay disparity between himself and Bellew and Zehr (the only two similarly-situated Caucasian employees) was pretextual. After reviewing the record on appeal, we reject plaintiff's contention.

In his brief in opposition to Boeing's motion for summary judgment, plaintiff discussed the law of pretext in general, but failed to discuss a single item of evidence that, in his view, established pretext. Thus, plaintiff arguably waived any assertion that Boeing's stated reasons were pretextual. See generally Conto v. Concord Hosp., Inc., 265 F.3d 79, 81 (1st Cir. 2001) (finding waiver where appellant failed to "ferret out and articulate the record evidence considered material to each legal theory advanced"). In his appellate brief, plaintiff essentially makes the same mistake, again discussing the law of pretext in general, but failing to discuss the relevant evidence. At best, plaintiff's appellate brief makes cryptic references to the deposition testimony of his supervisor Cecil Gardner, suggesting that Gardner's "testimony should have been credited and plaintiff's claims should have been allowed to proceed to a jury." Opening Br. at 27.

15

Having reviewed the portions of Gardner's deposition testimony submitted by plaintiff in opposition to Boeing's motion for summary judgment, we conclude there is nothing contained therein that would allow the jury reasonably to find that Boeing's stated reason for the pay disparity was pretextual. Indeed, Gardner's testimony arguably supports Boeing's position. In particular, Gardner testified in his deposition that he worked within the NSP system to get raises for plaintiff, utilizing the portions of his SELA fund he deemed appropriate to boost plaintiff's salary. Gardner further testified that the "record w[ould] show that [he] permanently got what [he] asked for" as far as raises for plaintiff. App. at 308. Finally, Gardner testified he "did not have a lot of interface with" the line managers or other employees in support services for the Commercial division (i.e., Bellew, Zehr, or their line managers), id. at 307, and there is no indication that he had any personal knowledge of the pay or raises given to Bellew, Zehr, or any other employees who supported the Commercial division.

*Plaintiff's March 1998 salary increase*

In his final argument, plaintiff contends the district court, in concluding there was no evidence of pretext, overlooked evidence indicating that Boeing immediately raised his salary when confronted by him in April 1998 regarding the pay disparity between himself and Martin and Lyon. Citing Goodwin v. General Motors Corp., 275 F.3d 1005 (10th Cir. 2002), plaintiff asserts this evidence was sufficient to establish pretext.

16

The initial problem with plaintiff's argument is that he did not present it to the district court in responding to Boeing's motion for summary judgment. Admittedly, the Goodwin decision was not issued until this year and was unavailable to plaintiff during the district court proceedings. Nonetheless, plaintiff could have asserted the factual argument without reliance on Goodwin. Thus, the argument has been waived for purposes of appeal. See Harrison, 248 F.3d at 1021.

Even overlooking plaintiff's waiver, there are several reasons why his argument is without merit. As noted above, we conclude that plaintiff has failed to present sufficient evidence to establish that Martin and Lyon were treated more favorably. Thus, any evidence relating to Martin and Lyon (e.g., plaintiff's complaint about a disparity between himself and Martin and Lyon, as well as Boeing's response thereto) is irrelevant. Further, even if there was sufficient evidence to establish that Martin and Lyon were treated more favorably than plaintiff, the fact that Boeing raised plaintiff's salary in response to his complaint about a disparity does not demonstrate that Boeing's stated reason for that disparity (i.e., that Martin and Lyon personally spoke to Gerry Johnson and involved him in their efforts to be promoted to salary grade 51) was pretextual. Finally, contrary to plaintiff's assertions, Goodwin is inapposite and offers no support. In Goodwin, the plaintiff alleged that she was paid less than other similarly-situated Caucasian employees. In response, the defendant employer asserted that the reason for the pay disparity was that it "simply could not afford to raise [the plaintiff's] salary to pay her as much as the other"

17

employees. 275 F.3d at 1013. The court concluded that the employer's stated reason could "clearly be viewed as pretextual in light of" the employer's "offer to increase [the plaintiff's] salary when she confronted them with the evidence of the pay disparity." Id. Here, in contrast, Boeing has never relied on an "inability to pay" rationale. Thus, the fact that it responded to plaintiff's internal complaint by raising his salary does not rebut its stated reason for the disparity.

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

18