**F I L E D**
United States Court of Appeals
Tenth Circuit

MAY 30 2000

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

HOWARD COOPERMAN and
TRUDY COOPERMAN,

      Plaintiffs-Appellants,

v.

MATT DAVID d/b/a/ WYOMING
RIVERS & TRAILS,

      Defendant-Appellee.

No. 98-8075

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 98-CV-009-D)**

Robert R. Rose, III of Rose & Rose, P.C., Cheyenne, Wyoming (Keith J. Stone of
the Law Offices of Keith J. Stone, San Diego, California, with him on the brief)
for Plaintiffs-Appellants.

Gary R. Scott of Hirst & Applegate, P.C., Cheyenne, Wyoming for Defendant-
Appellee.

Before **EBEL**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge and
**MURPHY**, Circuit Judge.

**EBEL**, Circuit Judge.

Appellants Howard and Trudy Cooperman ("the Coopermans") appeal the district court's grant of summary judgment in favor of Appellee Matt David, d/b/a/ Wyoming Rivers and Trails ("WRT") in this personal injury diversity action. The Coopermans argue that the district court erred when it found that a slipping saddle is an inherent risk of horseback riding. Because this record on summary judgment establishes, without genuine dispute, that it is an inherent risk of horseback riding that a saddle may slip because of a loose cinch, and because plaintiffs put on no evidence of a more specific cause for Dr. Cooperman's accident, we conclude that there are no material questions of fact precluding summary judgment. Thus, we AFFIRM the judgment of the district court.

## BACKGROUND

On August 11, 1997, Howard Cooperman ("Dr. Cooperman"), his wife Trudy, and several other family members hired WRT to guide them on a horseback ride in an area outside Pinedale, Wyoming. The ride took approximately forty-five minutes to an hour and a half to ride from Fort William to an area where the group stopped for lunch. The group then returned to Fort William by a different route.

When the Coopermans arrived at Fort William, they were ushered down to the corral where the horses were located by three employees of WRT. Once at the corral, the employees brought out the already saddled horses and matched riders

to the horses based on the size, weight, height, and experience of the riders and the disposition of the horses. Dr. Cooperman had informed the WRT employees that he was a novice rider with minimal prior experience riding horses. After the riders were matched with their horses for the day, one of the employees provided the Coopermans with a brief safety orientation, which included basic riding techniques and safety issues. Following the orientation, Dr. Cooperman was helped on to his horse by one of the employees, who had previously saddled and prepared the horse.

After all of the guests were seated on their horses, two of the employees led the group on the ride. Dr. Cooperman's morning ride up to the lunch spot was uneventful. At no time during that ride did he feel his saddle slipping, nor did it seem loose to him in any way. During the lunch break, Dr. Cooperman's saddle was loosened, but was tightened down again by one of the employees before he remounted the horse for the return trip to Fort William.

Approximately fifteen minutes after the lunch break, the group stopped, either to wait for slower riders or to rest the horses. At that point, Dr. Cooperman felt his saddle begin to slide. The saddle slipped all the way around the belly of the horse, causing Dr. Cooperman to fall to the ground and suffer injury to his right shoulder area. Prior to the saddle slipping, Dr. Cooperman had not had any

problems with his horse or his saddle, and had not sensed that anything was wrong with the saddle.

Dr. Cooperman brought suit against WRT in the United States District Court for the District of Wyoming alleging that WRT owed him a duty of reasonable care which was breached. Trudy Cooperman, Dr. Cooperman's wife, also brought a claim for loss of consortium as a result of WRT's allegedly negligent acts. WRT moved for summary judgment, arguing that under the Wyoming Recreation Safety Act ("the Safety Act"), a slipping saddle is an inherent risk of horseback riding. Thus, under the Safety Act, WRT owed Dr. Cooperman no duty of care. The Coopermans challenged the motion by arguing that the question of duty was for the jury and that slipping saddles were not an inherent risk of horseback riding. See Cooperman v. David, 23 F. Supp.2d 1315, 1316 (D. Wyo. 1998). The district court initially held that the question of whether slipping saddles are an inherent risk of horseback riding is a question of fact, and on that factual issue the court found there was a genuine dispute. Thus, the court denied summary judgment. After obtaining additional evidence on the question of whether slipping saddles are an inherent risk of horseback riding, primarily from the deposition testimony of plaintiffs' expert Mr. James Anderson, WRT filed a motion with the district court to reconsider its denial of summary judgment. Because the Safety Act had not been applied by a court in its current

form at the time WRT filed its first summary judgment motion, and thus neither party had clear guidance as to what issues were and were not relevant to the issue of inherent risk, and because additional evidence relevant to that question was subsequently obtained, the district court construed the motion to reconsider as a renewed motion for summary judgment. Id. at 1319. See also In re Independent Serv. Orgs. Antitrust Litig., 964 F. Supp. 1479, 1482 (D. Kan. 1997) (treating a motion for reconsideration as a renewed motion for summary judgment in light of new factual issues and legal arguments). The district court found that the evidence presented by WRT, in particular the testimony of the Coopermans' expert witness, showed that slipping saddles were an inherent risk of horseback riding. Because the district court found that the Coopermans had presented no evidence to dispute this finding, nor had the Coopermans put on evidence establishing a more precise cause for the accident that was not an inherent risk, the court determined that there were no material questions of fact precluding the grant of summary judgment. Thus, the court granted summary judgment in favor of WRT. The Coopermans appeal the court's grant of summary judgment.

## DISCUSSION

We review the grant of summary judgment de novo, applying the same legal standards as used by the district court. See Simms v. Oklahoma ex rel. Dep't of

Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999), cert. denied, 120 S.Ct. 53, 145 L.Ed. 2d. 46 (1999).

> Summary judgment is appropriate "if the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.

Id. Under the summary judgment standard, a mere factual dispute will not preclude summary judgment; instead there must be a genuine issue of material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

In addition, a federal court sitting in diversity must ascertain and apply state law to reach the result the Wyoming Supreme Court would reach if faced with the same question. See Shugart v. Central Rural Elec. Coop., 110 F.3d 1501, 1504 (10th Cir. 1997). We "'review de novo a district court's determination of state law.'" Id. (quoting Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991)).

The district court determined that the evidence in the record established that slipping saddles are a characteristic of horseback riding and thus qualify as an inherent risk. Under the Wyoming Recreation Safety Act, a provider of a recreational opportunity such as horseback riding has no duty or corresponding liability to participants for injuries resulting from inherent risks. See Wyo. Stat. Ann. § 1-1-123(a); see also Halpern v. Wheeldon, 890 P.2d 562, 565 (Wyo. 1995) (finding that the Safety Act employs the doctrine of primary assumption of risk, which limits the provider's duty to a participant).[1] The district court, therefore, granted summary judgment to WRT.

In order to prevail on any negligence action, a plaintiff must first establish that the defendant owed him or her a duty of care. See Halpern, 890 P.2d at 565. Whether WRT owed Dr. Cooperman a duty of care depends on whether the slipping saddle in this case was an inherent risk of horseback riding under the Wyoming Recreation Safety Act. Thus, the Coopermans carry the burden of

---

[1] The Wyoming Supreme Court distinguished between primary assumption of risk and secondary assumption of risk. Under primary assumption of risk there is no liability to the plaintiff because the defendant had no duty to the plaintiff. Secondary assumption of risk is a type of contributory negligence which is considered to be an affirmative defense that the defendant must raise and prove, after the plaintiff has met his or her burden of proving that the defendant breached a legal duty owed to the plaintiff. The absolute defense of secondary assumption of risk was abolished in Wyoming with the adoption of a comparative negligence statute. See Halpern, 890 P.2d at 565.

establishing that Dr. Cooperman's injury was not caused by an inherent risk. Id.

The Safety Act provides in relevant part:

> (a) Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity.
> (b) A provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity.
> (c) Actions based upon negligence of the provider wherein the damage, injury or death is not the result of an inherent risk of the sport or recreational opportunity shall be preserved pursuant to W.S. 1-1-109.

Wyo. Stat. Ann. § 1-1-123. The Safety Act defines inherent risk as "those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity." Wyo. Stat. Ann. § 1-1-122.

The Wyoming Supreme Court has analyzed the language of the Safety Act and determined that the legislature's use of assumption of risk terminology was intended to limit the duty that a provider owes to a participant. See Halpern, 890 P.2d at 565. The court defined this type of assumption of risk as primary assumption of risk. Id.[2] If the doctrine of primary assumption of risk is

_____

[2] Following the Halpern decision in 1995 but before Dr. Cooperman's accident in 1997, the Wyoming legislature amended the Act; however, the Wyoming Supreme Court in Keller v. Merrick, 955 P.2d 876, 879 (Wyo. 1998), a

(continued...)

- 8 -

applicable, a defendant cannot be liable to a plaintiff, "because there is no negligence on the part of the defendant to begin with; the danger is not one which defendant is required to extinguish or warn about; having no duty to begin with, there is no breach of duty to constitute negligence."  Catherine Hansen-Stamp, Recreational Injuries and Inherent Risks: Wyoming's Recreational Safety Act-An Update, 33 Land & Water L. Rev. 249, 253 (1998) (internal quotations and citations omitted); see also Madsen v. Wyoming River Trips, Inc., 31 F. Supp.2d 1321, 1326 (D. Wyo. 1999); W. Page Keeton et. al., Prosser and Keeton on the Law of Torts § 68, at 481 & n.10 (5th ed. 1984) (explaining that under primary assumption of risk the defendant is relieved of any duty that would otherwise exist).  Thus, if the slipping of Dr. Cooperman's saddle is an inherent risk of horseback riding under the Safety Act, WRT owed no duty and the court need never get to the issue of negligence.

Generally under Wyoming law, the issue of duty is decided by the court as a matter of law.  See Halpern, 890 P.2d at 565.  The Wyoming Supreme Court, however, has held that in certain instances, the issue of duty is a question of fact. See id.  In Halpern, the Wyoming Supreme Court held that whether a risk is

---

[2](...continued)
post-amendment decision, affirmed that the Safety Act continues to encompass the doctrine of primary assumption of risk.

inherent to an activity under the Safety Act is a question of fact for the jury. See

Halpern, 890 P.2d at 566.

The plaintiff in Halpern was injured when the horse he was attempting to

mount bucked and threw him to the ground. The plaintiff sued the ranch operator

for the injuries sustained in the fall. The district court granted summary

judgment, finding that being thrown from the horse was intrinsic to the sport of

horseback riding. Id. at 564. The Wyoming Supreme Court reversed, finding that

a genuine issue of material fact existed with regard to whether the risks

encountered by the plaintiff in mounting the horse were intrinsic to horseback

riding and whether the ranch operator could have reasonably eliminated, altered,

or controlled those risks.[3] Id. at 566. The court did concede, however, that in

certain instances where no material questions of fact exist, the district court may

---

[3] At the time of the Halpern decision, the Safety Act defined an inherent risk as "any risk that is characteristic of or intrinsic to any sport or recreational opportunity and which cannot reasonably be eliminated, altered or controlled." Wyo. Stat. Ann. § 1-1-122(a)(i) (1989) (emphasis added). The Wyoming legislature responded to the Halpern decision by eliminating the underlined portion of the inherent risk definition--whether the risk could be reasonably eliminated, altered or controlled. Thus, at the time of Dr. Cooperman's accident, inherent risk was defined with only one requirement, namely that it is a "danger[] or condition[] which [is] characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity." Wyo. Stat. Ann. § 1-1-122(a)(i). A careful reading of Halpern persuades us that the Wyoming Supreme Court would apply the same analytical approach to the amended Safety Act as it did to the Safety Act before this amendment. See Madsen, 31 F. Supp.2d at 1327.

decide as a matter of law that a provider does not owe a duty to the participant under the Safety Act. Id.

After the Halpern court held that the question of inherent risk was a question of fact, it then went on to determine whether there was a material dispute as to that question of fact which would preclude summary judgment. See Halpern, 890 P.2d at 566. We must do the same in this case. To determine what facts are material to the question of whether the risk in this case is an inherent risk of horseback riding, we must first ascertain what an inherent risk is. The Wyoming Safety Act defines inherent risk as those "dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational activity." Wyo. Stat. Ann. § 1-1-122(a)(i). In Halpern, the court implicitly found similar language under the preamendment Safety Act to be unambiguous and required the jury to make the necessary factual finding as to whether a risk was inherent. See Halpern, 890 P.2d at 565-66. We follow that lead.

Characteristic is defined as "belonging to or especially typical or distinctive of the character or essential nature of." Webster's Third New International Dictionary 376 (1986). Intrinsic means "belonging to the inmost constitution or essential nature of a thing: essential or inherent," id. at 1186, and integral is defined as "of, relating to, or serving to form a whole: essential to completeness." Id. at 1173. Hansen-Stamp's article discussing the Wyoming Safety Act provides

some helpful insight into the meaning of inherent risk under the Act. The author argues that inherent risks are one of two things. They are either "those risks which are essential characteristics of a sport and those which participants desire to confront," or they are undesirable risks which are simply a collateral part of the recreational activity. Hansen-Stamp, Inherent Risks, supra at 271; see also Madsen, 31 F. Supp.2d at 1327 (relying on Hansen-Stamp's definition of inherent risk when interpreting the Wyoming Safety Act). Armed with this understanding of inherent risk, we now turn to whether there are any material questions of fact precluding summary judgment.

Horseback riding undoubtedly carries some inherent risk that the rider will fall off the horse and get injured. A horse could stumble on an uneven path, or rear, or simply begin to gallop for no apparent reason. All of these risks clearly would qualify as inherent risks of horseback riding. Simply because some risks are inherent in horseback riding, however, does not mean that all risks of falling from a horse are necessarily inherent; instead, it is necessary to look factually at the specific risk to which the rider was exposed. When attempting to determine whether a risk is inherent to a sport, we can not look at the risk in a vacuum, apart from the factual setting to which the rider was exposed. And, we must evaluate the risk at the greatest level of specificity permitted by the factual record. See Madsen, 31 F. Supp.2d at 1328 ("The Court believes that one must look to the

specific facts of a case to see whether there is a duty, and not simply look to the abstract character of the risk.").

This was the approach taken by the Wyoming Supreme Court in Halpern. There the Wyoming Supreme Court reversed the district court's grant of summary judgment, holding that material questions of fact existed with regard to whether the specific risk encountered was inherent. In framing the duty issue the court took a fact specific approach, stating that the jury must decide "whether [the defendants] owed a duty to [plaintiff] by determining whether the risks encountered by [the plaintiff] while he was mounting his horse are inherent to the sport of horseback riding." Id. at 566. The court could have framed the inquiry at a high level of abstraction or generality as whether being thrown from a horse is an inherent risk. Instead, the court framed the issue such that the specific risks encountered by the defendant in connection with the mounting procedures were to be considered.

In determining whether a certain risk is inherent to a sport, we are taken to the level of specificity that the facts support. While at some level all sports have inherent risks, as we add in the facts of a specific risk encountered the risk may or may not be inherent.[4] "Thus, the duty question is best resolved by framing the

_____

[4] It is important to remember, however, that in framing the duty question, we are not to ask whether the recreational provider could have controlled or

(continued...)

- 13 -

question correctly." Madsen, 31 F. Supp.2d at 1328. For example, if the only fact presented to the court is that the horse bucked while the rider was properly sitting on the horse, we would frame the duty question as whether a bucking horse is an inherent risk of horseback riding. However, if the facts established that the owner of the horse lit firecrackers next to the horse and the horse bucked, we would ask whether a horse bucking when firecrackers are lit next to the horse is an inherent risk of horseback riding.[5]

Turning to the present case, we need to examine the risk at the level of specificity to which the facts lead us. The facts show that the saddle slipped. If

_____

[4](...continued)
eliminated the risk. The Wyoming Safety Act states that once a risk is determined to be inherent, the provider "is not required to eliminate, alter or control the inherent risks. . . ." Wyo. Stat. Ann. § 1-1-123(b). Thus, we are simply to look at the specific facts which surround the risk without questioning the provider's ability to control or eliminate those risks. And because at this stage of the analysis we are focusing only on duty, we do not ask if the defendant was negligent in any of its actions with regard to the plaintiff.

[5] The parties have cited to numerous saddle slipping cases to support their argument that a slipping saddle either is or is not an inherent risk of horseback riding. Compare Douglas v. Holzhouser, 404 N.Y.S.2d 528, 529-30 (Sup. Ct. 1978) (holding that plaintiff could not recover for injuries sustained from a slipping saddle because she voluntarily assumed the risk, where the facts showed that the defendant properly cinched and checked the saddle), with Liossis v. Cavalry Riding Academy Co., 87 N.E.2d 266, 268 (Ohio Ct. App. 1949) (holding that a slipping saddle was not a risk assumed by the rider when the facts showed the saddle was not properly cinched). The different outcomes in these cases can be explained by the differing factual scenarios present in each case. While slipping saddles under certain fact specific situations may be inherent, under other facts it may not be inherent.

this were the only fact with which we were presented, we would quickly agree with the district court and hold that saddle slipping is an inherent risk of horseback riding. The Coopermans' own expert testified that saddles slip for a variety of reasons including: stretching leather, the tensing or relaxing of a horse, the horse losing weight from sweat, the compression of certain types of saddle pads and loosening of the cinch due to the movement of the horse, or the rider failing to ride straight in the saddle. The expert further stated that a slipping saddle is always a possibility when horseback riding; that this was not the first time a saddle had slipped and it would not be the last. This evidence clearly indicates that a slipping saddle is an undesirable risk which is simply a collateral part of horseback riding. Cf. Hansen-Stamp, Inherent Risks, supra at 271. Thus, a slipping saddle, with no other facts provided, is an inherent risk of horseback riding.

This case, however, presents facts which take us to a greater degree of specificity than simply stating that the saddle slipped. Thus we must take the analysis one step further. The Coopermans presented evidence that after Dr. Cooperman fell off the horse, his saddle was hanging loosely under the belly of the horse. One of WRT's employees testified that "if the saddle just fell off and was hanging loosely under the belly, then obviously the saddle wasn't tightened

enough." For purposes of summary judgment, then, the issue is whether a slipping saddle that is loosely cinched is an inherent risk of horseback riding.

As discussed above, it is inherent that a saddle will slip, and the plaintiffs' expert testified that saddles will slip for a variety of reasons. The expert also testified that although there are dangers in cinching the saddle too loosely, there are also dangers in cinching the saddle too tightly. For example, if a saddle is cinched too tightly the expert testified that the horse may roll, which could also obviously result in injury to the rider. Thus, because cinching a saddle is done by hand, and not with scientific precision, a provider must make a judgment call as to how tight or loose to cinch the saddle. This imprecision in the cinching of the saddle is "characteristic" or "typical" of and therefore "inherent in" the sport of horseback riding. It is an undesirable risk which is simply a collateral part of the sport. When the cinching of a saddle can be too tight or too loose, and the cinching is not done with scientific precision, it is inherent in the sport that the provider at times will cinch too loosely or too tightly. Thus, the testimony of WRT's employee that a saddle hanging underneath a horse would be evidence that the saddle was not cinched tightly enough does not take us outside the realm of inherent risk. It does not explain why the saddle was not cinched tightly enough.

As part of the Coopermans' burden of showing that WRT owed Dr. Cooperman a duty of care, the Coopermans must provide some evidence to

explain why the saddle fell, which explanation is not inherent to the sport. The Wyoming Legislature expressly stated in the Safety Act that a recreational provider has no duty to "eliminate, alter or control the inherent risks within the particular sport or recreational opportunity." Wyo. Stat. Ann. § 1-1-123(b). Thus, stating only that the cinch was not tight enough does not show that the risk was no longer inherent to the sport. The Coopermans have the burden of presenting some evidence on summary judgment that would raise a question of fact that the loosely cinched saddle was caused, not by an inherent risk, but rather by a risk that was atypical, uncharacteristic, not intrinsic to, and thus not inherent in, the recreational activity of horseback riding. The Coopermans have not met this burden.

Because under Wyoming law the question of what is an inherent risk is normally a question of fact for the jury, we do not attempt to set the parameters here as to what factual proof would take the risk of a slipping saddle outside the realm of an inherent risk. We can only say that presenting testimony that the saddle was not cinched tightly enough is not sufficient. As a result, this court agrees that there is no genuine dispute of material fact that would preclude summary judgment. We therefore AFFIRM the district court's grant of summary judgment in favor of WRT.