SUSAN PINTO *vs.* REVERE-SAUGUS RIDING ACADEMY, INC.,
& another.[1]

No. 08-P-318.

Suffolk. December 17, 2008. - June 8, 2009.

Present: DUFFLY, DREBEN, & RUBIN, JJ.

*Negligence,* Equine activities. *Practice, Civil,* Summary judgment.

In a civil action brought by a plaintiff who had suffered injuries while riding a
  horse at the defendants' stable, the judge properly granted the defendants'
  motion for summary judgment on the plaintiff's claim that the defendants
  had provided faulty equipment or tack for the horse so as to give rise to li-
  ability under G. L. c. 128, § 2D(*c*)(1)(i), where the plaintiff's proffered
  evidence was insufficient to show that either the equipment or the tack was
  faulty [393-395]; however, given the proffered evidence of the horse's
  skittish conduct before the accident, the judge erred in granting summary
  judgment in favor of the defendants on the plaintiff's claim that the defend-
  ants had failed to determine the plaintiff's ability to manage a particular
  horse safely based on her representations that she was a beginner, in viola-
  tion of G. L. c. 128, § 2D(*c*)(1)(ii) [395].

CIVIL ACTION commenced in the Superior Court Department on
September 15, 2005.

The case was heard by *Paul E. Troy*, J., on a motion for sum-
mary judgment.

*Peter F. Brady, Jr.*, for the plaintiff.

*Joseph A. King* (*Amy R. Riley* with him) for the defendants.

DREBEN, J. This appeal involves the scope of protection ac-
corded to persons engaged in equine activities by G. L. c. 128,
§ 2D. The plaintiff, while riding a horse named Twilight at the
defendants' stable, became unable to control him. The horse was
running fast and the plaintiff felt her saddle slipping. Fearing that

---

[1]Wallace A. Ward, doing business as Revere-Saugus Riding Academy, Inc.
The parties do not argue that Ward's liability is different from that of the
corporation, and we do not address that issue.

she was going to fall beneath the horse, she threw herself off and was injured. She brought this action against the defendants, alleging that their actions fall within the statutory exceptions to the protection from liability under c. 128, § 2D. A judge of the Superior Court allowed the defendants' motion for summary judgment. We affirm in part and vacate in part.

*Background.* Viewed in the light most favorable to the plaintiff, see *Cabot Corp.* v. *AVX Corp.*, 448 Mass. 629, 636-637 (2007), the materials presented to the judge showed the following. On September 25, 2002, the plaintiff, accompanied by her mother and a friend, Philip Morse, arrived at the defendants' riding academy to purchase a riding horse for her and her children. She told the stable manager that she was a beginner,[2] and that she was looking for a "bomb proof" horse, a "dead broke horse." By those terms she meant a horse that was safe, calm, and easy to control. Wallace A. Ward, the individual defendant, indicated in his deposition that in dealing with prospective buyers, the defendants would rely on the information or description provided by the prospective buyers and would not otherwise seek to determine their level of experience.

After describing the kind of horse she was looking for, the plaintiff was shown a nine or ten year old thoroughbred, named Twilight, who had been trained as a race horse, but had not made it because he was too slow. According to Ward, Twilight had been purchased three or four years prior to the plaintiff's accident and had undergone extensive retraining for use as a "school horse" for lessons.[3]

Although it was the defendants' practice that only the defendants' personnel or those given permission would tack[4] the horses

---

[2]Although in her deposition the plaintiff denied that she told the stable manager she was a beginner, in her answers to interrogatories she stated she told the manager that she was a beginner and needed a safe horse. Morse in his deposition stated that he heard her say she was a beginner.

[3]The plaintiff reported that Hillary McKenna, the young daughter of a woman who was contracted to clean the stables, and who came to the plaintiff's aid after the injury, told her, "I can't believe [the stable manager] would put you on a horse that just got off the track." The judge declined to consider this statement on the ground that it was hearsay. The plaintiff claims it was admissible as an excited utterance.

[4]Tack is defined in the American Heritage Dictionary 1760 (4th ed. 2006) as "[t]he harness for a horse, including the bridle and saddle."

for a prospective buyer, the plaintiff, who had gone to get a helmet while Twilight was being tacked, indicated that the farrier,[5] a girl named Hillary McKenna, and another girl were tacking the horses. Once Twilight was tacked, the farrier rode the horse around the riding arena. The plaintiff noticed that the horse was prancing and tossing his head, and appeared to have a lot of energy, "too much energy." "[I]t looked . . . to [the plaintiff] that [the farrier] was having a hard time" getting the horse to listen. After the farrier had warmed up Twilight, the stable manager asked the plaintiff if she would like to ride the horse. With the assistance of the stable manager, the plaintiff mounted Twilight, and based on her knowledge from going on trail rides, she squeezed her heels towards his belly to make him go.

The horse and the plaintiff went around the arena two or three times, and then the plaintiff asked the manager if she could try him in a trot. Receiving an affirmative answer, the plaintiff squeezed Twilight a little more (she had learned this during her approximately ten times of trail riding). Halfway around the arena Twilight broke out into a full gallop. The plaintiff tried to pull back on the reins to stop him, but she could not control the horse. As he galloped, the saddle started sliding to the left, and the plaintiff unsuccessfully tried to straighten out the saddle at the same time as she was trying to stop the horse. In order not to fall underneath his legs, the plaintiff "kind of threw [herself] off of him onto the cement." Morse saw the saddle slip to about a thirty-degree angle. After the plaintiff's mother and Morse helped her up, McKenna came over to help and made the statement set forth in note 3, *supra*. Once caught, Twilight was given a different bridle and seemed "more comfortable."[6]

We turn to the statute, G. L. c. 128, § 2D.[7] Subsection (*a*)

---

[5]The farrier was not an employee but rather an independent contractor engaged to shoe the horses.

[6]In October, 2002, the plaintiff returned to the stable and, with her children, took riding lessons as part of a beginner's riding program for children.

[7]Subsection 1 of 1992 House Doc. No. 3767 (the bill that became c. 128, § 2D) points out, among other things, that equine activities "represent a substantial industry in Massachusetts" and support other businesses and industries, that there are "inherent risks in equestrian activities which should be understood by all participants and which are essentially impossible for the operators of equine activities to eliminate," and that the cost of liability insurance "has been rising substantially for those who sponsor equine activities." Therefore, "[i]t shall be the purpose of this Act to preserve the equine agriculture

provides certain definitions.[8,9] Subsection (*b*) provides:

> "Except as provided in subsection (*c*), an equine activity sponsor, an equine professional, or any other person, which shall include a corporation or partnership, shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities and, except as provided in said subsection (*c*), no participant nor participant's representative shall make any claim against, maintain an action against, or recover from an equine activity sponsor, an equine professional, or any other person for injury, loss, damage, or death of the participant resulting from any of the inherent risks of equine activities."

G. L. c. 128, § 2D, inserted by St. 1992, c. 212.

Subsection (*c*), in relevant part, provides:

> "Nothing in subsection (*b*) shall prevent or limit the liability of an equine activity sponsor, an equine professional, or any other person if the equine activity sponsor, equine professional, or person:
>
> > "(1)(i) provided the equipment or tack, and knew or should have known that the equipment or tack was faulty, and such equipment or tack was faulty to the extent that it did cause the injury; or (ii) provided the equine and failed to make reasonable and prudent efforts to determine the

in the Commonwealth by defining those areas of responsibility and those affirmative acts for which the operators of equestrian businesses shall be liable for loss, damage, or injury suffered by participants expressly assume and for which there can be no recovery."

[8]Among its definitions are "equine professional" and "participant." We need not reproduce those definitions, as the parties agree that the defendants are equine professionals and that the plaintiff is a participant.

[9]Subsection (*a*) also defines "inherent risks of equine activities" as "dangers or conditions which are an integral part of equine activities, including but not limited to: (1) The propensity of equines to behave in ways that may result in injury, harm, or death to persons on or around them; (2) the unpredictability of an equine's reaction to such things as sounds, sudden movement, and unfamiliar objects, persons, or other animals; (3) certain hazards such as surface and subsurface conditions; (4) collisions with other equines or objects; (5) the potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his ability." G. L. c. 128, § 2D, inserted by St. 1992, c. 212, § 1.

ability of the participant to engage safely in the equine activity, and determine the ability of the participant to safely manage the particular equine based on the participant's representations of his ability;

"...

"(3) commits an act of omission that constitutes willful or wanton disregard for the safety of the participant, and that act of omission caused the injury."

*Ibid.*

Relying on the language of subsection (*c*), the plaintiff asserted claims that purported to fall within both (*c*)(1)(i) and (*c*)(1)(ii). She alleged that the defendants had provided faulty equipment or tack for Twilight and that they knew or should have known that the equipment was not adequately secured. She also alleged that the defendants failed to make reasonable and prudent efforts to determine the plaintiff's ability to engage safely in an equine activity and to determine the ability of the plaintiff to safely manage Twilight, and as a result the plaintiff was injured.

We address the two claims in light of the standard for reviewing a grant of summary judgment, namely, whether "viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law." *Cabot Corp.* v. *AVX Corp.*, 448 Mass. at 636-637. The moving parties, here the defendants, in a case where the plaintiff has the burden of proof at trial, are entitled to summary judgment if they demonstrate that the plaintiff has no reasonable expectation of proving an essential element of her case. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). They need not submit "affirmative evidence to negate one or more elements of the [plaintiff's] claim." *Ibid.*

1. *Claim of faulty equipment or faulty tacking.*[10] In attempting

---

[10]The defendants point to the language of c. 128, § 2D, and argue that improper tacking as contrasted to furnishing improper tack or equipment is not covered by subsection (*c*)(1)(i). For purposes of this opinion only, we assume without deciding that subsection (*c*)(1)(i) rather than subsection (*c*)(3) applies.

to show that the saddle or the bridle was faulty or that they were improperly tacked, the only facts to which the plaintiff points are that the saddle slipped and that the farrier and McKenna performed the tacking. This evidence is insufficient to show that the equipment or the tacking was faulty. While there was evidence that it was the practice of the defendants that only their personnel or those to whom they gave permission would tack horses, and while there was also evidence that the farrier's job was not to tack horses, there was no evidence that those who tacked the horse were not tacking the horse with the defendants' permission, or that those who tacked the horse lacked the training or the skill required to tack it properly.

Contrary to the plaintiff's urging that the principles of *Wilson* v. *Honeywell, Inc.,* 409 Mass. 803, 806 (1991), apply here, this is not a case where a jury can infer from the slipping of the saddle alone that the defendants provided a faulty tack or that the tacking was improper. See *Cooperman* v. *David,* 214 F.3d 1162, 1168 (10th Cir. 2000). Under the Wyoming Recreation Safety Act, Wyo. Stat. Ann. §§ 1-1-121 et seq., plaintiffs are required to provide some evidence to explain why a saddle fell, that is, to give an explanation that is not inherent to the sport. *Id.* at 1168-1169. While there may be occasions when a plaintiff can produce evidence of defects in the tack or the tacking so as to avoid summary judgment, see, e.g., *Steeg* v. *Baskin Family Camps, Inc.,* 124 S.W.3d 633, 639-640 (Tex. App. 2003), decided under Tex. Civ. Prac. & Rem. Code Ann. § 87.003-87.004 (2003), a statute similar to the Massachusetts statute, the plaintiff here has not done so. Many reasons have been proffered in cases as to why a saddle may slip. See *Cooperman, supra* at 1168.[11] Equally important, even if the tack or the tacking was faulty, the plaintiff has not produced any evidence that the defendants "knew or should have known that the equipment or tack was faulty, and such equipment or tack was faulty to the extent that it did cause the injury," G. L. c. 128, § 2D(*c*)(1)(i).

---

[11]In that case, the plaintiffs' "expert testified that saddles slip for a variety of reasons including: stretching leather, the tensing or relaxing of a horse, the horse losing weight from sweat, the compression of certain types of saddle pads and loosening of the cinch due to the movement of the horse, or the rider failing to ride straight in the saddle. The expert further stated that a slipping saddle is always a possibility when horseback riding." *Cooperman, supra* at 1168.

Since the summary judgment materials indicate that the plaintiff is unable to prove essential elements of her claim, the motion judge properly granted summary judgment for the defendants on the allegations of faulty equipment or faulty tacking.

2. *Claim of failure to determine the plaintiff's ability to manage the particular equine (Twilight) safely based on her representations that she was a beginner.* The plaintiff's deposition testimony indicated that before she mounted Twilight, he was "prancing" and "tossing his head," showing "too much energy," and it appeared that the farrier also was having a difficult time controlling the horse. The stable manager, who was present while the farrier was riding, asked the plaintiff whether she wanted to mount. This was so despite the representations of the plaintiff that she was a beginner and wanted a safe horse. Although there was evidence that there had been no previous complaints about the horse, the skittish conduct of the horse known to the stable manager was sufficient to present a jury question whether the horse's behavior during the farrier's ride put the stable manager, or a reasonable professional in her place, on notice that at that time the plaintiff, a beginner, did not have sufficient ability to ride Twilight.[12] Accordingly, it was error to grant summary judgment on the claim under subsection (c)(1)(ii).

In conclusion, so much of the judgment as dismisses the plaintiff's claim under G. L. c. 128, § 2D(c)(1)(ii), is vacated, and that claim is remanded to the Superior Court for further proceedings. In all other respects the judgment is affirmed.

*So ordered.*

---

[12]Our conclusion does not take into account McKenna's statement. See note 3, *supra.* Whether the statement will be admissible at trial we leave to the determination of the trial judge.