**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 5, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MICHAEL L. ROBERTS; JESSICA E. WAYBRIGHT, Husband & Wife,

     Plaintiffs - Appellants,

v.

JACKSON HOLE MOUNTAIN RESORT CORPORATION, a Wyoming corporation,

     Defendant - Appellee.

No. 17-8018

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:16-CV-00024-KHR)**
_____

Robert E. Schroth, Sr. (Robert E. Schroth, Jr. with him on the briefs), Jackson, Wyoming, appearing for the appellants.

James K. Lubing, Lubing Law Group, LLC (Nathan D. Rectanus with him on the brief), Jackson, Wyoming, appearing for the appellee.
_____

Before **BRISCOE**, **EBEL**, and **MATHESON**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

    In 2014, while skiing an untamed and ungroomed run inside the boundaries of Jackson Hole Ski Resort, Plaintiff Michael Roberts skied into a lightly covered pile of boulders, falling between two of them, and severely injuring himself. He sued

Jackson Hole Mountain Resort ("JHMR") to recover for his injuries, and his wife joined his lawsuit alleging loss of consortium.

JHMR moved for summary judgment on the basis of the Wyoming Recreation Safety Act ("WRSA") which limits a recreational activity provider's liability for so-called "inherent risks" of the activity. The district court granted summary judgment, holding that Roberts's injuries were the result of an "inherent risk" of alpine skiing. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we now AFFIRM the district court in full.

## I.  BACKGROUND

Located within the boundaries of the world-famous Jackson Hole Ski Resort, Saratoga Bowl is an adventurous skier's dream hill. The off-piste[1] bowl is dotted with trees, rocks, and vast swaths of open, often-untouched snow that weave throughout these natural obstacles unguided by the ministrations of JHMR's tree-cutters.

On February 14, 2014, with this winter paradise rendered even more inviting by roughly a foot of fresh, fluffy, Wyoming powder, Michael Roberts—an experienced skier and ski instructor at his local mountain in California—and four friends headed for the Bowl. Once there, they began to pick their way down the hill, stopping frequently due to the many obstacles and heavy snow. One member of Roberts's group, Nick Parsell, was wearing a GoPro video camera on which he

---

[1] The two parties use the term "off-piste" to mean terrain that is not only "ungroomed," but also is left in its natural state.

2

captured the group's descent into the bowl and the many trees and visible rocks and rock formations throughout the hill.[2]

After skiing through the trees at the top of the run, Nick Parsell skied down below the rest of the group so that he could film them skiing toward him. As Parsell stops to look up at his companions, an exposed rock formation is clearly visible off to his left. GoPro video 3:05. The skiers head toward Parsell one-by-one, and Roberts is the second to angle down the mountain. As he passes Parsell, the video shows Roberts taking a sweeping left turn perpendicular to the Bowl's fall line. Id. at 3:33. As the camera turns back uphill, a vague commotion can be heard from below.

According to Roberts, "as [he] was initiating [his] right hand turn into the fall line, [he] clipped a rock and started to tumble[,] [ultimately] end[ing] up in a hole, up to [his] neck in snow." Aplt. App. at 193. Another member of the group testified that Roberts "smashed" into a hole between several rocks. Aplt. App. at 315. This same member later clarified that where Roberts fell

> there were two very large boulders side by side that there was a – like a crevice in–between them so they were separated. So when he skied – he skied over the – over the top of one of the rocks and then he hit the wall of the second rock and then disappeared down into that crevice. So that was one of the structures. And so see that was where he fell in, but there were a number of other very hazardous deep holes including the one that the ski instructor [who stopped to help] fell down into and we had to pull out, and including the one that I fell [into] when I tried to get within 15 meters of Mr. Roberts at the accident.

Aplt. App. at 312.[3]

---

[2] The video, on which this description is based, was included in the appellate record. Aplt. App. at 507 ("GoPro Video"). Citations to the video will be to the time stamp.

3

After the fall, one of Roberts's companions called ski patrol, whose members soon arrived and were able to evacuate Roberts from the mountain. He was taken first to an emergency room in Jackson before later being flown to Salt Lake City for emergency surgery. As a result of his fall, Roberts "fractured his pelvis, broke seven (7) ribs, lacerated his liver, punctured a lung, and incurred various less serious injuries." Aplt. Br. at 10.

In 2016 Roberts and his wife Jessica Waybright brought this diversity suit, governed by Wyoming law, against JHMR in the District of Wyoming alleging premises liability, personal injury, negligence, negligent training and supervision, and loss of consortium. Following discovery, JHMR moved for summary judgment on the grounds that the Roberts' claims were barred by the WRSA. The district court granted JHMR's motion and the plaintiffs timely appealed.

## II. DISCUSSION

We review de novo a district court's grant of summary judgment, "ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015). Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[3] "On an appeal from a ruling granting summary judgment, 'we examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party, without making credibility determinations or weighing the evidence.'" Lounds v. Lincare, Inc., 812 F.3d 1208, 1213 (10th Cir. 2015) (quoting Hernandez v. Valley View Hosp. Ass'n, 684 F.3d 950, 953 n.2 (10th Cir. 2012)). Accordingly, where deposition testimony differs as to the hazard Roberts encountered, we defer to his and his witnesses' characterization of the hazard.

4

matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is inappropriate where there is a genuine dispute over a material fact, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material if its determination "might affect the outcome of the suit under the governing law."  Id.

In this diversity suit we apply the substantive law of Wyoming, endeavoring to "ascertain and apply state law to reach the result the Wyoming Supreme Court would reach if faced with the same question."  Cooperman v. David, 214 F.3d 1162, 1164 (10th Cir. 2000).  To do so we rely foremost on decisions of the Wyoming Supreme Court, and then on "other state court decisions, federal decisions, and the general weight and trend of authority."  Sapone v. Grand Targhee, Inc., 308 F.3d 1096, 1100 (10th Cir. 2002).

**A. The Wyoming Recreation Safety Act**

This is not the first time we have been asked to evaluate a Wyoming recreational provider's liability for injuries arising from participation in a recreational activity.  See, e.g., Kovnat v. Xanterra Parks & Resorts, 770 F.3d 949, 955 (10th Cir. 2014); Dunbar v. Jackson Hole Mountain Resort Corp., 392 F.3d 1145, 1148 (10th Cir. 2004); Cooperman, 214 F.3d at 1162.  Liability for personal injuries is ordinarily evaluated through common-law tort doctrine, but in these cases the Wyoming legislature has limited the duty of care owed by recreational providers, including ski resorts, by enacting the WRSA.  Dunbar, 392 F.3d at 1148.

5

Specifically, the WRSA codifies the common-law concept of primary assumption of the risk. See Cooperman, 214 F.3d at 1165, 1165 n.1. Under the WRSA,

> [a]ny person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death . . . that results from the inherent risks in that sport or recreational opportunity.

Wyo. Stat. Ann. § 1-1-123(a). The Act further provides that "[a] provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity." Id. § 1-1-123(b). The WRSA does not, however, preclude a plaintiff from prevailing on a negligence claim against a ski resort when he or she suffers "damage, injury or death [that] is not the result of an inherent risk" of alpine skiing. Id. at § 1-1-123(c). Alpine skiing is a "sport or recreational opportunity" governed by the WRSA, id. § 1-1-122(a)(iii), and JHMR is a "provider," id. § 1-1-122(a)(ii).

To understand exactly how the WRSA adjusts common-law tort doctrine, it is useful to return to foundational tort principles. The basic elements of a negligence claim are: duty, breach, causation, and damages. See, e.g., Greenwalt v. Ram Restaurant Corp. of Wyo., 71 P.3d 717, 737 (Wyo. 2003) ("It is elementary that the traditional elements of a negligence tort claim are duty, breach of duty, proximate cause, and damages."). By codifying the doctrine of primary assumption of the risk, the WRSA targets the first of these elements: duty. See Halpern v. Wheeldon, 890 P.2d 562, 565 (Wyo. 1995) ("Under the clear and unambiguous language of the

6

[WRSA], the assumption-of-risk terminology is intended to limit the duty which a provider owes to a participant. This type of assumption of risk is known as primary assumption of risk."). Primary assumption of risk is distinguishable from secondary assumption of the risk. While the latter is an affirmative defense to be raised "after the plaintiff has met his burden of proving that the defendant breached a legal duty which he owed to the plaintiff," id., the former implicates the very question of whether a duty was "owed" altogether, id. When primary assumption of the risk applies, as it does under the WRSA, "the legal result is that the defendant is simply relieved of the duty which would otherwise exist." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 68, at 481 & n.10 (5th ed. 1984).

The question under the WRSA, then, is whether the "damage, injury or death" suffered by the plaintiff was the result of "an inherent risk" of alpine skiing. Wyo. Stat. Ann. § 1-1-123(a)–(c). If so, then the provider, JHMR in this instance, owes no duty to the plaintiff, and we have no occasion to consider whether the steps taken by the Resort were negligent in nature,[4] and summary judgment is appropriate.

### a. Inherent Risk

The WRSA defines an inherent risk as "those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational activity." Wyo. Stat. Ann. § 1-1-122(a)(i); see also Cooperman, 214 F.3d at 1166–67 (analyzing dictionary definitions of "characteristic," "intrinsic," and "integral"). While normally the issue of duty is settled by the court as a matter of law, see

---

[4] Subject to the affirmative creation of the risk doctrine, discussed later.

Halpern, 890 P.2d at 565 (Wyo.), whether something qualifies as an "inherent risk" for the purposes of the WRSA is a question generally submitted to the jury, Beckwith v. Weber, 277 P.3d 713, 722 (Wyo. 2012). This is because "the level of factual specificity required to establish an inherent risk will often but not always preclude summary judgment on the duty question." Creel v. L & L, Inc., 287 P.3d 729, 737 (Wyo. 2012). "When, as is typically the case, 'genuine issues of material fact exist, it is proper to present the issue to the jury of whether a risk is inherent to a particular activity.'" Kovnat, 770 F.3d at 955 (quoting Halpern, 890 P.2d at 566 (Wyo.)). However, "where no genuine issues of material fact exist, the district court may decide as a matter of law that the provider does not owe a duty to the participant." Halpern, 890 P.2d at 566 (Wyo.).

When presented with a motion for summary judgment on the question of whether something qualifies as an "inherent risk," then,

> [t]he trial court must scrutinize the facts brought forward by the parties with great care. If the court can say that, given that evidence, this is an 'inherent risk' and reasonable minds cannot differ about that, then summary judgment is appropriate. If the risk is an inherent one, then the provider has no duty to eliminate, alter, or control it. On the other hand, if reasonable minds could differ as to whether or not the risk was one inherent to the recreational activity, then summary judgment is not appropriate and the answer to the question must be assigned to the jury (or other fact finder).

Jackson Hole Mountain Resort Corp. v. Rohrman, 150 P.3d 167, 168 (Wyo. 2006).

### 1) Defining the Risk

Our first task is to define the risk to which Mr. Roberts was exposed. When defining the risk, "we are taken to the level of specificity that the facts support."

8

Cooperman, 214 F.3d at 1167.[5]  For example, in Cooperman we considered the case of a plaintiff who had fallen off her horse and was alleging that the provider had not sufficiently tightened the cinch on her saddle.  Id. at 1163–64.  Rather than asking "whether being thrown from a horse is an inherent risk" of horseback riding, id. at 1167, we defined the question as "whether a slipping saddle that is loosely cinched is an inherent risk of horseback riding," id. at 1168.

Understandably, the parties in this case offer dramatically different interpretations of the "risk" to which Roberts was exposed.  Appellants would have us decide whether "skiing into a hidden 6-to-8-foot chasm on a marked trail within the ski area boundary is an inherent risk of the sport."  Aplt.'s Br. at 17.  JHMR, on the other hand, would prefer we expand our inquiry to whether "skiing into an unmarked, snow-covered rock formation, on a black diamond, off-piste ski run, [is] an inherent risk of alpine skiing."  Aple.'s Br. at 29.

On de novo review we supplement these suggestions with our own review of the facts in the record.  The only eyewitness to the incident, Craig Parsell, testified that the scene of Roberts's injury involved "two very large boulders side by side that

---

[5] The Cooperman court explained the required level of specificity thusly:

> For example, if the only fact presented to the court is that the horse bucked while the rider was properly sitting on the horse, we would frame the duty question as whether a bucking horse is an inherent risk of horseback riding.  However, if the facts established that the owner of the horse lit firecrackers next to the horse and the horse bucked, we would ask whether a horse bucking when firecrackers are lit next to the horse is an inherent risk of horseback riding.

214 F.3d at 1167.

9

there was a – like a crevice in-between them so they were separated." Aplt. App. 312. He continued: "So when [Roberts] skied – he skied over the – over the top of one of the rocks and then he hit the wall of the second rock and then disappeared down into that crevice." Id. The first ski patrol member to arrive on the scene described the hazard thusly:

> **A:** It was, you know a – a large rock pile, very obviously a rock pile . . . what I remember about it is – I mean, it was very, very difficult for me to even get to him . . . [t]here was a lot of new snow, and it was kind of unconsolidated over the rocks in that area and so it was – you know, the situation where there was a lot of snow but not enough to be supportable so [that] you would just punch through into the void that these – that the large talus field creates with the snow on top of it.
> **Q:** I – describe it as, maybe, 6 to 12 feet, some of the holes?
> **A:** Yes, I would say. . . . I don't know how else to describe it other than just a – a – a large pile of large rocks covered with fresh snow that was, you know, a difficult spot. . . . I don't really recall a depth right there. I mean, it was – if you can imagine, you know, the boulders the size of – they're large, they're – varying in size but up to very large and kind of all just stacked and so there would be areas where you could step and it was fine and then right next to it, you'd put your foot through and there would be, you know, a hole six or eight feet kind of down, wedging into the rocks.

Aplt. App. at 373–74.

While Roberts would prefer we focus solely on the hazard he encountered, the context in which he encountered that obstacle is equally relevant. From our review of the GoPro video it is clear Saratoga Bowl is an untamed area attractive to skiers precisely because it contains natural obstacles and ungroomed terrain. The video depicts a run awash with trees and the occasional visible boulder. In fact, when Nick Parsell stops to look back up at

10

the skiers above him just prior to Roberts's accident, a large well created by a boulder is clearly visible off to his left. GoPro video at 3:05.

Accordingly, we define the risk at the level of specificity supported by this record, and ask: Whether encountering boulders, and gaps between them, in changing snow conditions in an off-piste area of a ski resort is an "inherent risk" of alpine skiing.

### 2)  Evaluating the Risk

The answer to this question may only be decided on summary judgment if no reasonable juror could disagree as to its answer. Rohrman, 150 P.3d at 168 (Wyo.). The relevant case law, however, provides useful guidance for when the inherency of a risk can be decided on summary judgment and when it cannot.

In 1995 the Wyoming Supreme Court considered a case under the predecessor statute to section 1-1-123(a). There, a recreational provider was sued for not providing more supervision for a patron who was mounting a horse. Halpern, 890 P.2d at 566 (Wyo.). At this time, the Wyoming Code defined an "inherent risk" as "any risk that is characteristic of or intrinsic to any sport or recreational opportunity *and which cannot be reasonably eliminated, altered, or controlled.*" Wyo. Stat. Ann. 1-1-122(a)(i) (1989) (emphasis added). The Halpern court held that the provider could have reasonably eliminated the inherent risk of mounting a horse by providing more adequate assistance, and so denied summary judgment for the provider. 890 P.2d at 566 (Wyo.).

11

In response, the legislature moved quickly to amend the statute. During the next session the legislature passed what is now section 1-1-123(b), which says that "[a] provider of any sport or recreational opportunity is *not* required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity." Wyo. Stat. Ann. § 1-1-123(b) (emphasis added).

Following this amendment, a critical distinction has emerged in the case law between a provider's failure to control inherent risks (which is no longer actionable), and actions that affirmatively enhance existing risks (which remain actionable). For example, in Creel, a spectator standing near the green at a golf tournament was struck by a ball hit by a player on the preceding tee box. 287 P.3d at 731 (Wyo.). The Wyoming Supreme Court agreed with the operator of the golf course that getting struck with a ball was an inherent risk of attending a golf tournament, but still found summary judgment inappropriate. Id. at 738. It reasoned that "the question we must answer is whether [the defendant] did anything to increase the risk that Mr. Creel would be hit by a golf ball." Id. The court found that the defendant had increased the risk because an agent of the defendant had encouraged the golfer to hit even though the golfer was worried about hitting into the players and spectators in front of him. Id. at 743.

The court in Creel relied heavily on this Court's analysis in Dunbar. In that case, also at Jackson Hole Resort, the plaintiff skied into a "terrain park" on the mountain intending to "investigate" the area. 392 F.3d at 1146. The plaintiff ultimately decided she did not want to ski any of the terrain park's features, and so

12

she asked an employee how to exit the area without having to encounter the obstacles. Id. at 1147. One of the options she was given was to ski down the hill in the direction of a "catwalk." Id. The plaintiff followed those instructions, but they actually led her to the entrance to a snowboard "half-pipe," into which the plaintiff fell, suffering severe injuries. Id.

This Court reversed the district court's grant of summary judgment for the Resort. Id. at 1153. The Court concluded that "whatever risks [the plaintiff] assumed herself, it seems clear that she did not also assume the risk of needing to interpret the delphic statements of Jackson Hole's employees." Id. The Court continued: "Both Jackson Hole and the district court focus on the issue of choices that Dunbar made, ignoring the choice that Jackson Hole made for her in directing her to exit the terrain park area by either hiking out the main entrance or skiing along the catwalk." Id.

Unlike Dunbar, this case does not involve JHMR affirmatively exacerbating the inherent risks of alpine skiing. Mr. Roberts was not directed to Saratoga Bowl by an employee offering "delphic statements" about its safety; in fact advanced skiers "in search of fresh untracked and unconsolidated powder" are attracted to off-piste terrain such as Saratoga Bowl *because* it is ungroomed, untamed, and provided the types of natural obstacles that distinguish such runs from those frequented by less talented skiers. Aplt. App. at 205. Perhaps Roberts may not have expected to encounter the type of gap into which he fell, but we cannot ignore the nature of the run on which he encountered it and the inherent risks that run presents. See Wyo.

13

Stat. Ann. § 1-1-123(a) ("Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, *whether those risks are known or unknown* . . . .") (emphasis added). Boulders and the gaps of widely varying dimensions between them—at times exposed to the elements and at others lightly covered by fresh snow—are an inherent risk of skiing an off-piste run such as Saratoga Bowl.

### 3) Expert Testimony

We recognize, however, that whether something qualifies as an "inherent risk" under the WRSA is generally a question for the jury. Beckwith, 277 P.3d at 722 (Wyo.). We have, in the past, affirmed summary judgment for recreational providers, see, e.g., Kovnat, 770 F.3d at 958–59, but doing so is only appropriate "when reasonable persons could only conclude that an injury or death was caused by an inherent risk." Beckwith, 277 P.3d at 722 (Wyo.).

The district court held that while "it may be unusual and extremely dangerous, . . . it is clear the possibility of being injured or encountering natural occurring hazards associated with rocks and rock formations are inseparably intertwined with and intrinsic to alpine skiing." Dist. Ct. Order at 11–12. While we generally agree with this statement, we need to address the fact that plaintiff offers expert testimony that reaches the opposite conclusion. Aplt. App. at 269–74 (Expert Report of Larry Heywood).

In reviewing Mr. Heywood's report, however, we believe his conclusions put the cart before the horse. He extensively addresses the historical practice of the

14

Jackson Ski Patrol in marking "dangerous obstacles that are not obvious to skier traffic," Aplt. App. at 274, and the fact that "[t]here were no warning signs at the lower entrance to Saratoga Bowl informing skiers of the limited snow cover and unmarked hazards in Saratoga Bowl," id. He then concludes that had "a warning sign been at the entrance Micahel [sic] Roberts would not have entered Saratoga Bowl and been injured." Id.[6]

These observations are inapposite. As detailed above, the WRSA is crystal clear that if a hazard is an "inherent risk" of alpine skiing, JHMR is under no obligation to warn Mr. Roberts of its existence. Wyo. Stat. Ann. § 1-1-123(a)–(b). To return to our foundational tort principles, Mr. Heywood's report targets JHMR's alleged breach, the second element of Torts 101, without establishing the first element, which is the existence of JHMR's duty. To be sure, the "Opinions" section of Mr. Heywood's report does end with the phrase: "This hazard was not integral to skiing in Saratoga Bowl and was not an inherent risk to skiing in Saratoga Bowl." Aplt. App. at 274. However this is nothing more than an unsupported and conclusory statement and courts in the Tenth Circuit have held that such statements, even from experts, are insufficient to defeat summary judgment, see, e.g., Matthiesen v. Banc One Mortg. Corp., 173 F.3d 1242, 1247 (10th Cir. 1999), including in the context of

---

[6] On summary judgment the Court accepts this assertion as fact because it is drawn directly from Mr. Roberts's deposition testimony. Aplt. App. at 295.

15

the WRSA, <u>Cooperman v. David</u>, 23 F. Supp. 2d 1315, 1318 (D. Wyo. 1998), <u>aff'd</u>, 214 F.3d 1162 (10th Cir. 2000).[7]

Expert testimony may, in some instances, be particularly persuasive on the issue of inherent risk in the WRSA context. For example, in <u>Sapone v. Grand Targhee</u>, a six-year-old rider had fallen from a horse when the horse suddenly "bolted" down the trail. 308 F.3d 1096, 1098 (10th Cir. 2002). The Court acknowledged that "it is an inherent risk that a horse might bolt," but also that <u>Cooperman</u> required it to address the question in greater specificity. <u>Id.</u> at 1104. There, expert testimony that the provider had offered inadequate instructions, too large of a horse, and poor headgear was relevant in assessing whether the *particular* risk to which this plaintiff was exposed as a result of the provider's activity was inherent in the activity of horseback riding. <u>Id.</u>; <u>see also</u> <u>Dunbar</u>, 392 F.3d at 1153 ("We have made clear that a duty of care may arise from choices made for the participant by the recreation provider.").

But where, as here, the provider did nothing to exacerbate the inherent risk posed by the hazard, conclusory expert testimony is not itself enough to preclude summary judgment. Mr. Heywood's testimony contains no analysis about the inherent risk of encountering covered boulders on off-piste trails, or whether this

---

[7] In <u>Cooperman,</u> the district court rejected the conclusion of plaintiff's expert that "equipment failure is an 'inherent risk' of horseback riding" because that opinion "reache[d] the ultimate legal conclusion without expressing how the risk is not characteristic of, intrinsic to or an integral part of horseback riding." <u>Cooperman</u>, 23 F. Supp. 2d at 1318.

hazard was an inherent risk of a trail littered with trees and other natural obstacles. See Aplt. App. at 269–74.

Accordingly, we AFFIRM the district court's grant of summary judgment in favor of JHMR on the basis of the WRSA.

**B. The Forest Service Contract**

Appellants argue in the alternative that even if JHMR did not owe Roberts a duty pursuant to the WRSA, the Resort's contract with the United States Forest Service ("USFS") obligated it to assume a higher duty of care than the statutory requirement. Aplt.'s Br. at 30.

JHMR, like many ski resorts, has a permit from the USFS to operate a ski resort on National Forest Land. As a condition of this permit, JHMR is required to submit a "Winter Operating Plan" ("WOP") to the USFS for approval, and that WOP incorporates by reference the JHMR ski patrol manual. Appellants note that the manual contains an express requirement that "[u]nusual hazards on ski trails will be marked by members of the Ski Patrol." Aplt. App. at 491. Their argument, then, while far from clear, seems to be that this manual, as incorporated into JHMR's contract with the USFS, establishes JHMR's liability with regard to Roberts's injuries.[8]

---

[8] Appellee urges us to dismiss this argument as improperly raised because of its lack of clarity. We disagree. "Vague, arguable references" in district court proceedings will not preserve an issue for appeal, Bancamerica Comm. Corp. v. Mosher Steel of Kan., Inc., 100 F.3d 792, 798 (10th Cir. 1996), but here appellants arguably raised this issue in even more detail at the district court than they do here, and certainly in sufficient detail to preserve appellate review, see, e.g., Aplt. App. at 236–37 ("Pl.'s

On one hand, it almost sounds as if Appellants are now trying to advance a contract claim under the theory that they are a third-party beneficiary of JHMR's contract with the USFS, and that JHMR breached that contract by failing to adhere to the letter of their ski patrol manual. It would be improper for us to consider such a claim, however, because the Complaint sounded in tort, rather than contract, law. See Aplt. App. at 1-9. Furthermore, if we were to consider a contract claim arising from JHMR's contract with the USFS, nothing in that agreement establishes a private right of action. Perhaps, if JHMR violated the terms of its agreement with the USFS by not marking this hazard then the USFS could revoke JHMR's permit or seek other remedies under the contract, but that is not the case before us today.

To the extent, however, that Appellants rely on the USFS contract to establish a standard of care in their tort action, that argument too must fail. As we have discussed at length above, the question of whether a recreational provider met the applicable standard of care is only relevant if we first determine the existence of a duty. Because we conclude that, under the WRSA, JHMR owes no duty to Appellants to mark hazards such as the one into which Roberts fell, we have no occasion to determine whether the USFS contract imposes a standard of care beyond mere negligence.

Finally, even if the contract did impose a heightened duty, the manual itself expressly disclaims any reliance on its language that "[u]nusual hazards . . . will be

_____

Mem. of Law in Opp. to Def.'s Mot. for Summ. J.") ("Additionally, defendant JHMR assumed a higher duty of care than the limited requirements of the . . . WRSA.").

18

marked." Aplt. App. at 491. The full statement from the manual reads: "Unusual hazards on ski trails will be marked by members of the Ski Patrol. *It is understood that it is physically impossible to mark all hazards, as during the skiing day many hazards are exposed by skiers, wind, or other weather conditions.*" Aplt. App. at 491 (emphasis added). First, as discussed previously, there is no evidence that large crevices, rocks, and trees are unusual hazards in off-piste terrain. Furthermore, the language from the manual, taken in its entirety, is sufficient for us to conclude even if a heightened standard of care was imposed by the USFS contract, it would not require JHMR to mark all obstacles that a skier could encounter during his or her time on the mountain, particularly in off-piste terrain.[9]

## III.    CONCLUSION

When Mr. Roberts entered Saratoga Bowl on February 14, 2014, he expected to find steep terrain, natural obstacles, and untouched powder. We accept that he did not expect to encounter the particular hole or void between rocks into which he ultimately fell and injured himself. But under the WRSA when a tragic accident—regardless how severe the consequences—is the result of an inherent risk of alpine skiing, recreational providers are immune from liability. When a skier drops into an off-piste run littered with visible obstacles including trees and rocks, it is an inherent

---

[9] In considering a similar argument for provider-liability based on a WOP which incorporates a ski patrol manual, one California court called the assertion "absurd," and ultimately concluded that "[t]o the extent plaintiff relies on the manual to provide a duty, it expressly indicates that not every trail boundary can or will be marked . . . . Plaintiff's argument is not well taken." O'Donoghue v. Bear Mountain Ski Resort, 30 Cal. App. 4th 188, 193–94 (Cal. Ct. App. 1994).

risk that he will encounter unseen obstacles as well.  The WRSA reflects careful policy judgments made by the Wyoming legislature, and it is neither our prerogative nor our inclination to disrupt that regime.  The district court is AFFIRMED in full.