2006 WY 100

**Sharon MULLER and Jeff Muller, Appellants (Plaintiffs),**

v.

**JACKSON HOLE MOUNTAIN RESORT, Appellee (Defendant),**

and

**State of Wyoming, Appellee (Intervenor).**

No. 05–207.

Supreme Court of Wyoming.

Aug. 11, 2006.

Representing Appellant: William R. Fix and Jenna V. Mandraccia of William R. Fix, P.C., Jackson, Wyoming. Argument by Mr. Fix.

Representing Appellees: Carter H. Wilkinson and James K. Lubing of Lubing Law Office, Jackson, Wyoming, for Appellee Jackson Hole Mountain Resort. Argument by Mr. Lubing. No appearance on behalf of Appellee State of Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL *, and BURKE, JJ., and ARNOLD, D.J.

HILL, Justice.

[¶ 1] By order entered on September 20, 2005, this Court agreed to answer questions certified to us pursuant to W.R.A.P. 11, by the United States Court of Appeals for the Tenth Circuit. In that order we designated Sharon Muller and Jeff Muller (Muller or Mullers) as Appellants. Jackson Hole Mountain Resort (Resort) is the Appellee.

**THE CERTIFIED QUESTIONS**

[¶ 2] These are the questions we agreed to answer:

1. Pursuant to Wyo. Stat. Ann. § 1–1–122(a)(ii), Wyoming's Recreational Safety Act (RSA) "does not apply to a cause of action based upon the design or manufacture of sport or recreational equipment or

* Chief Justice at time of oral argument.

products or safety equipment used incidental to or required by the sport or recreational opportunity." The magistrate judge interpreted this provision as a product liability provision applying to design and manufacture claims. Does the design and manufacture component of the statute apply to products and safety equipment or only sport and recreational equipment? Does this exemption exclude the operation of a ski lift by a recreational provider from the protections of the RSA?

[¶ 3] Our general answer to this question is "No." However, to specifically answer the compound questions posed: We conclude that the section at issue is not ambiguous and the Act does not apply to those items listed by it, i.e., the Act does not apply to the design or manufacture of sports equipment or products, or recreational equipment or products, or safety equipment, the use of which is incidental to the sport or recreational activity; and, "No," this statute does not exclude a ski lift operated by a recreational provider from the protections of the RSA.

2. The RSA provides that "[a]ny person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity." Wyo. Stat. Ann. § 1-1-123(a). The RSA defines inherent risks as "those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity." Wyo. Stat. Ann. § 1-1-122(a)(i). Are inherent risks of alpine skiing limited to skiing, can an injury that occurs while boarding the ski lift be an inherent risk of alpine skiing, and can the injury in this case be such an inherent risk?

[¶ 4] Our answer to this question is also generally "No." However, to specifically answer the compound question posed: The "inherent risks" of alpine skiing are not limited only to the act of skiing; an injury that occurs while boarding a ski lift may be an

"inherent risk" of skiing; and the injury in this case may be an "inherent risk" of skiing.

3. If not mooted by the answers to Questions 1 and 2, is the operator of a ski lift a common carrier, and if so, what standard of care is owed to those riding on a ski lift gondola?

[¶ 5] Our answers above render this question moot.

## FACTS AND PROCEEDINGS

[¶ 6] We accept the "Procedural and Factual Background" set out in the Tenth Circuit's certification document:

The presiding United States Magistrate Judge for the District of Wyoming noted that "Ms. Muller was outfitted with ski equipment, she was wearing ski boots, and was attempting to board the Bridger Gondola at Jackson Hole Mountain Resort in order to ride to the top of the hill to begin her day of skiing. While attempting to board the gondola, Sharon Muller's ski boot became caught under the exterior rack on the Bridger Gondola and she was allegedly dragged several feet, the result of which were painful injuries to her leg and knee." Appendix at 32. Noting its finding on a special verdict form, following a trial with the magistrate judge presiding, the jury concluded that Muller's injuries resulted from an inherent risk of the recreational activity in which she was taking part. The Mullers argued before the trial court and before this court on appeal that the RSA was not applicable to their case.

[¶ 7] Because it became a focus of the argument before the court, we take note that while boarding the Bridger Gondola, skiers are not wearing their skis; rather, they are stowed on exterior racks affixed to the gondola. We also discern from the briefs and from argument that no motion to dismiss or motion for summary judgment was filed in this case. It was contemplated from the outset that the "inherent risk" in question here was one for the jury to resolve. The trial was held in Jackson.

**The Statutes**

[¶ 8] We set out the statutes at issue in their entirety:

§ 1–1–121. Recreation Safety Act; short title.

This act shall be known and may be cited as the "Recreation Safety Act".

§ 1–1–122. Definitions.

(a) As used in this act:

(i) **"Inherent risk" with regard to any sport or recreational opportunity means those** *dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport* **or recreational opportunity** [Emphasis added.];

(ii) "Provider" means any person or governmental entity which for profit or otherwise, offers or conducts a sport or recreational opportunity. This act does not apply to a cause of action based upon the design or manufacture of sport or recreational equipment or products or safety equipment used incidental to or required by the sport or recreational opportunity;

(iii) "Sport or recreational opportunity" means commonly understood sporting activities including baseball, softball, football, soccer, basketball, swimming, hockey, dude ranching, nordic or alpine skiing, mountain climbing, river floating, hunting, fishing, backcountry trips, horseback riding and any other equine activity, snowmobiling and similar recreational opportunities;

(iv) "Equine activity" means:

(A) Equine shows, fairs, competitions, performances or parades that involve any or all breeds of equines;

(B) Any of the equine disciplines;

(C) Equine training or teaching activities, or both;

(D) Boarding equines;

(E) Riding, inspecting or evaluating an equine belonging to another, whether or not the owner has received some monetary consideration or other thing of value for the use of the equine or is permitting a prospective purchaser of the equine to ride, inspect or evaluate the equine;

(F) Rides, trips, hunts or other equine activities of any type however informal or impromptu;

(G) Day use rental riding, riding associated with a dude ranch or riding associated with outfitted pack trips; and

(H) Placing or replacing horseshoes on an equine.

(v) Repealed by Laws 1996, ch. 78, § 2.

(vi) "This act" means W.S. 1–1–121 through 1–1–123.

§ 1–1–123. Assumption of risk.

(a) Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity.

(b) A provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity.

(c) Actions based upon negligence of the provider wherein the damage, injury or death is not the result of an inherent risk of the sport or recreational opportunity shall be preserved pursuant to W.S. 1–1–109.[1]

Wyo. Sta. Ann. §§ 1–1–121—1–1–123 (LexisNexis 2005).

**STANDARD OF REVIEW**

[¶ 9] Because we are answering certified questions from the United States Tenth Circuit Court of Appeals, and because our answers must rely on the very limited factual background provided in the Tenth Circuit's submission to us and the Joint Appendices submitted by the parties, our traditional standards of review are only tangentially of service. However, the principle

---

1. Wyo. Stat. Ann. § 1–1–109 (LexisNexis 2005) is    Wyoming's comparative fault statute.

source of our answers must come from the statutes at issue, and so our resolution of this matter must be guided by our well established principles of statutory construction:

> In interpreting statutes, our primary consideration is to determine the legislature's intent. All statutes must be construed in pari materia and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is de novo. We endeavor to interpret statutes in accordance with the legislature's intent. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute in pari materia. When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. We must not give a statute a meaning that will nullify its operation if it is susceptible of another interpretation. Moreover, we will not enlarge, stretch, expand, or extend a statute to matters that do not fall within its express provisions.

*Sponsel v. Park County,* 2006 WY 6, ¶ 9, 126 P.3d 105, 108 (Wyo.2006).

## DISCUSSION

[¶ 10]   **Question No. 1.**

1.   Pursuant to Wyo. Stat. Ann. § 1–1–122(a)(ii), Wyoming's Recreational Safety Act (RSA) "does not apply to a cause of action based upon the design or manufacture of sport or recreational equipment or products or safety equipment used incidental to or required by the sport or recreational opportunity." The magistrate judge interpreted this provision as a product liability provision applying to design and manufacture claims. Does the design and manufacture component of the statute apply to products and safety equipment or only sport and recreational equipment?

Does this exemption exclude the operation of a ski lift by a recreational provider from the protections of the RSA?

[¶ 11]   As noted above, our general answer to this question is "No." However, to specifically answer the compound questions posed: We conclude that the section at issue is not ambiguous and does not apply to those items listed by it, i.e., it does not apply to the design or manufacture of sports equipment or products, or recreational equipment or products, or safety equipment, the use of which is incidental to the sport or recreational activity; and, "No," this statute does not exclude a ski lift operated by a recreational provider from the protections of the RSA.

[¶ 12]   Wyoming's statute provides that the: "(i) 'Inherent risk' with regard to any sport or recreational opportunity means those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity[.]" In addition, it provides that: "Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity[,]" and that "[a] provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity."

[¶ 13]   What an "inherent risk" means in any given set of circumstances is a variable that the Wyoming Legislature included in the statute by design. The parties point us to the statutes of other states that are more specific in this regard. See, e.g., Colo.Rev. Stat. Ann. § 33–44–103(3.5) (West 2005); and see Steven L. Nelson, Annotation, *Cause of Action Against Ski Area Operator for Injury or Death Occurring on Ski Slope or Lift,* 5 C.O.A.2d 719 § 22 (1994 and Supp.2001); and Irving D. Gaines, *Skiing Accident Litigation,* 15 Am.Jur. Trials 147, esp. § 23 (1968 and Supp.2005). The Colorado statute includes a nonexclusive list of circumstances that meet the "inherent risk" test, and is also specific in

stating that "[n]othing in this section shall be construed to limit the liability of the ski area operator for injury caused by the use or operation of ski lifts." § 33–44–103(3.5).

[¶ 14] Under Wyoming's statutory construct, which is much broader than that of Colorado, such items as those included in Colorado's statute may, as a matter of law, be inherent risks of the recreational activity of skiing (in such cases a trial court may grant a motion to dismiss or a motion for summary judgment based on the RSA). Other items included in the list, and others that are not listed, and including the use or operation of ski lifts[2] may, as a matter of fact, be "inherent risks" although those questions must be decided by the fact finder based on the evidence presented. See generally James H. Chalat, *Liability of Ski Area Operator for Skiing Accident*, 45 Am.Jur. POF3d 115, 150–51, § 17 (Broad judicial interpretation of inherent danger ski statutes as primary assumption of risk) (1998 and Supp.2005); also see Catherine Hansen–Stamp, *Recreational Injuries and Inherent Risks: Wyoming's Recreational Safety Act—An Update*, 33 Land & Water L.Rev. 249 (1998); also see *Halpern v. Wheeldon*, 890 P.2d 562, 566 (head note [9] ) (Wyo.1995); *Dunbar v. Jackson Hole Mountain Resort*, 392 F.3d 1145, 1148–53 (10th Cir.2004) (injuries suffered by skier in a terrain park that offered the most difficult skiing opportunities, which instant skier wished to avoid and asked a Resort employee for direction in order to avoid it, not an "inherent risk" as a matter of law but, rather, a question for the jury); and *Cooperman v. David*, 214 F.3d 1162 (10th Cir.2000) (loose saddle cinch an inherent risk of horseback riding as a matter of law).

[¶ 15] Wyoming's "inherent risk" construct is, perhaps, best captured in these well chosen words from Chief Justice Benjamin Cardozo in the case, *Murphy v. Steeplechase Amusement Company*, 250 N.Y. 479, 166 N.E. 173, 174–75 (N.Y.1929):

> Volenti non fit injuria. One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball. . . . The antics of the clown are not the paces of the cloistered cleric. The rough and boisterous joke, the horseplay of the crowd, evokes its own guffaws, but they are not the pleasures of tranquility. The plaintiff was not seeking a retreat for meditation. Visitors were tumbling about the belt to the merriment of onlookers when he made his choice to join them. He took the chance of a like fate, with whatever damage to his body might ensue from such a fall. The timorous may stay at home.
>
> A different case would be here if the dangers inherent in the sport were obscure or unobserved . . ., or so serious as to justify the belief that precautions of some kind must have been taken to avert them. . . . Nothing happened to the plaintiff except what common experience tells us may happen at any time as the consequence of a sudden fall. Many a skater or a horseman can rehearse a tale of equal woe. A different case there would also be if the accidents had been so many as to show that the game in its inherent nature was too dangerous to be continued without change. The president of the amusement company says that there had never been such an accident before. A nurse employed at an emergency hospital maintained in connection with the park contradicts him to some extent. She says that on other occasions she had attended patrons of the park who had been injured at the Flopper, how many she could not say. None, however, had been badly injured or had suffered broken bones [as did the plaintiff in this case]. Such testimony is not enough to show that the game was a trap for the unwary, too perilous to be endured. According to the defendant's estimate, 250,000 visitors were at the Flopper in a year. Some quota of accidents was to be looked for in so great a mass. One might as well say that a skating rink

---

**2.** See generally Donald M. Zupanec, Annotation, *Liability for Injury or Death from Ski Lift, Ski Tow, or Similar Device*, 95 A.L.R.3d 203 (1979 and Supp.2005).

should be abandoned because skaters sometimes fall.

Also see *Wright v. Mt. Mansfield Lift, Inc.,* 96 F.Supp. 786, 790–92 (D.Vt.1951) (relying on and applying rule articulated in *Murphy* ); and *Bouchard v. Johnson,* 555 N.W.2d 81, 86 (N.D.1996); and compare *Sunday v. Stratton Corporation,* 136 Vt. 293, 390 A.2d 398, 401 (1978) (recognizing rule articulated in *Murphy* and *Wright,* but concluding that brush concealed by snow on a novice trail which had been carefully groomed to remove most natural obstacles, i.e., that it was like a fairway, completely flat and designed to achieve a perfect surface for skiing, was not an inherent risk of the sport (skier fell and suffered injury resulting in quadriplegia)).

■■ [¶ 16] In summary, we hold that under Wyoming's Recreational Safety Act a ski lift, such as the Bridger Gondola, may be an "inherent risk" of skiing, as inherent risk is defined in the Wyoming statute, and that the particular injury suffered in this case may be an inherent risk of skiing. Our analysis in this regard is not affected by the circumstance that in some instances skiers may not be wearing skis while boarding a ski lift.

[¶ 17] **Question No. 2**

2. The RSA provides that "[a]ny person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity." Wyo. Stat. Ann. § 1–1–123(a). The RSA defines in-

herent risks as "those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity." Wyo. Stat. Ann. § 1–1–122(a)(i). Are inherent risks of alpine skiing limited to skiing, can an injury that occurs while boarding the ski lift be an inherent risk of alpine skiing, and can the injury in this case be such an inherent risk?

[¶ 18] Our answer to this question is also generally "No." However, to specifically answer the compound question posed: The "inherent risks" of alpine skiing are not limited only to the act of skiing; an injury that occurs while boarding a ski lift may be an inherent risk of skiing; and the injury in this case may be an "inherent risk" of skiing.

## CONCLUSION

[¶ 19] We conclude that the RSA is, in part, a products liability statute that is unambiguous on its face. Further, the RSA does not necessarily exclude a ski lift from its protections. The inherent risks of skiing are not limited only to the act of skiing, and an injury suffered while boarding a ski lift (with skis stowed on the exterior of the lift) may be an inherent risk of skiing. Finally, the incident described in the materials provided to this Court, for the purpose of resolving these questions, may be an inherent risk of skiing.