FILED
United States Court of Appeals
Tenth Circuit

May 14, 2021

Christopher M. Wolpert
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

THOMAS A. STANDISH, IV;
MEGHAN KEITER,

       Plaintiffs - Appellants,

v.

JACKSON HOLE MOUNTAIN
RESORT CORPORATION,

       Defendant - Appellees.

No. 20-8045

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WYOMING
(D.C. NO. 1:19-cv-00004-KHR)

---

Gary L. Shockey, Gary Shockey Law, Casper, Wyoming, for Appellants.

James K. Lubing (Nathan D. Rectanus with him on the brief), Lubing Law Group, Jackson, Wyoming, for Appellee.

---

Before **TYMKOVICH**, **KELLY**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

      While skiing in an ungroomed area at Jackson Hole Mountain Resort,

Thomas Standish was injured when his right ski struck a six-and-a-half-foot

stump covered with freshly fallen snow. Standish and his wife brought a negligence lawsuit against Jackson Hole Mountain Resort ("Jackson Hole") to recover for his injuries.

Jackson Hole moved for summary judgment, contending the Wyoming Recreation Safety Act (WRSA) limited Jackson Hole's liability because Standish's injury was a result of an "inherent risk" of alpine skiing. The district court granted summary judgment, finding that a tree stump covered by fresh snow was an inherent risk of skiing for which the WRSA precludes liability. We agree with that conclusion. Thus, exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

In January 2017, California residents Thomas Standish and his then-fiancée, Megan Keiter, traveled to Jackson Hole Mountain Resort as part of a "bucket list" ski trip. From January 8 through 10—the three days prior to Standish's arrival—Jackson Hole had received about 27 inches of new snow, and on the morning of January 11, Jackson Hole received an additional 18 inches of snow. Over these four days, the mid-mountain depth of the snow increased from 56 to 80 inches.[1]

---

[1] Though the numbers do not add up precisely, this fact is undisputed. The discrepancy may be due to the variance in measurements between lift-base depth

(continued...)

On January 11, the couple purchased ski passes for Jackson Hole. The backs of these "J Cards" bear language indicating that the pass-holder "acknowledges that participation in any and all winter recreation activities at [Jackson Hole], including . . . skiing . . . involves SUBSTANTIAL AND INHERENT RISKS, HAZARDS, AND DANGERS THAT MAY RESULT IN SERIOUS INJURY, DEATH or damages to property." Aplt. App. 41. The couple first skied a few groomed runs. They then ventured down an off-piste run near the Thunder Chairlift line, with Standish—the more experienced skier—leading the way. "Off-piste" is a term for a ski run or area that is ungroomed and left in its natural state. *See Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 970 (10th Cir. 2018). About halfway down the mountain, Standish's right ski hit the top of a six-and-a-half-foot-tall tree stump that was covered with about two inches[2] of fresh snow. His ski came off on impact, and he broke multiple bones in his right leg.

Standish underwent surgery, receiving fourteen screws, two metal plates, and a bone graft. After returning to California a few days later, Standish suffered a pulmonary embolism, a common complication resulting from serious fractures.

---

[1](...continued)
and mid-mountain depth, as well as other environmental factors like wind.

[2] The district court came to this number by subtracting the height of the tree (78 inches) from the approximate depth of snow (80 inches). Neither party contests this finding on appeal.

This required anti-coagulation injections in his abdomen for several months. Because of Standish's long recovery, he and Keiter pushed their wedding back from June to September 2017. They also sold their business because Standish was unable to work during his recovery.

In January of 2019, Standish and Keiter brought this diversity suit in the District of Wyoming against Jackson Hole, alleging negligence and loss of consortium, respectively. During discovery, the parties were unable to ascertain when, why, or by whom the tree had been cut. In a deposition, Jackson Hole's risk safety and environmental manager agreed that the stump had been cut at some point in the past, but no individuals or departments he talked to had any recollection or knowledge of cutting that tree. When asked why it was cut in the way it had been—that is, over six feet high—the manager suggested "it had been cut down during the winter to mitigate a hazard, like the tree blowing over or growing in a particular way that may have been identified to be a hazard." Aple. App. 63. In October 2019, the stump was cut down completely, apparently as a result of the accident and the ongoing litigation.

Jackson Hole moved for summary judgment, which the district court granted. The district court concluded that Wyoming law provided immunity from the inherent risks of skiing, including unmarked objects on ungroomed runs—even objects like trees that have been partially cut.

## II. Analysis

Standish makes two arguments about why the district court erred in granting summary judgment. First, he contends that the question of whether a subsurface, cut tree in an off-piste area is an inherent risk of alpine skiing should have been submitted to a jury. Second, Standish argues the district court improperly considered inadmissible facts in granting summary judgment. We address each in turn.

### A. Inherent Risk

#### 1. Standard of Review

We review a district court's grant of summary judgment de novo. *Roberts*, 884 F.3d at 971. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Because this diversity suit arises out of Wyoming, we "must ascertain and apply state law to reach the result the Wyoming Supreme Court would reach if faced with the same question." *Cooperman v. David*, 214 F.3d 1162, 1164 (10th

Cir. 2000).  In doing so, "we rely foremost on decisions of the Wyoming Supreme Court, and then on 'other state court decisions, federal decisions, and the general weight and trend of authority.'"  *Roberts*, 884 F.3d at 972 (quoting *Sapone v. Grand Targhee, Inc.*, 308 F.3d 1096, 1100 (10th Cir. 2002)).  We review the district court's determination of state law de novo.  *Cooperman*, 214 F.3d at 1164.

### 2.  *The Wyoming Recreation Safety Act*

Common-law tort principles typically guide our analysis of personal-injury claims brought on the basis of negligence.  When bringing a negligence claim, a plaintiff must sufficiently assert that "(1) the defendant owed the plaintiff a duty to conform to a specified standard of care; (2) the defendant breached the duty of care; (3) the breach proximately caused injury to the plaintiff; and (4) the injury is compensable by money damages."  *Dimick v. Hopkinson*, 422 P.3d 512, 521 (Wyo. 2018)  (internal quotation marks omitted).

But in enacting the WRSA, the Wyoming legislature chose to insulate recreational providers from some types of personal-injury claims.  In relevant part, the WRSA[3] provides that

---

[3] On July 1, 2017, Wyoming's Ski Safety Act went into effect.  *See* Wyo. Stat. Ann. § 1-1-123.2 (2020).  This Act takes ski-area skiing out of the purview of the WRSA.  In other words, now the Ski Safety Act, rather than the WRSA, sets out the statutory scheme for actions based on skiing at a ski area.  But as the district court found, the parties in this case agree the Ski Safety Act is inapplicable to this case because the accident occurred before the law became effective.

[a]ny person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity.

Wyo. Stat. Ann. § 1-1-123(a). And a recreational provider "is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity." Wyo. Stat. Ann. § 1-1-123(b).

### a. Duty Under the WRSA

The WRSA limits the first negligence element: duty. Specifically, the WRSA "codifies the common-law concept of primary assumption of the risk," which limits the recreational provider's duty to a participant. *Roberts*, 884 F.3d at 972; *see also Halpern v. Wheeldon*, 890 P.2d 562, 565 (Wyo. 1995) ("[T]he assumption-of-risk terminology [in the WRSA] is intended to limit the duty which a provider owes to a participant."). "When primary assumption of the risk applies, as it does under the WRSA, 'the legal result is that the defendant is simply relieved of the duty which would otherwise exist.'" *Roberts*, 884 F.3d at 972 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 68, at 481 & n.10 (5th ed. 1984)). In other words, because the WRSA provides that a participant has assumed certain risks that are inherent to the activity, the recreational provider typically owes no duty for inherent risks of an activity. In

-7-

sum, a recreational "provider has no duty to eliminate, alter, or control the inherent risks of an activity, and any person who chooses to take part in a sport or recreational opportunity assumes all inherent risks [that] are associated with that opportunity." *Halpern*, 890 P.2d at 565.

The district court generally decides whether the defendant owed a duty as a matter of law, *see Halpern*, 890 P.2d at 565, but the jury typically decides whether a particular risk is an inherent one, *see Beckwith v. Weber*, 277 P.3d 713, 722 (Wyo. 2012). In the context of whether a hazard is an inherent risk, the "level of factual specificity required . . . will often but not always preclude summary judgment on the duty question." *Creel v. L & L, Inc.*, 287 P.3d 729, 737 (Wyo. 2012). So "when genuine issues of material fact exist, it is proper to present the issue to the jury of whether a risk is inherent to a particular activity." *Halpern*, 890 P.2d at 566. But in the absence of genuine issues of material fact, "the district court may decide as a matter of law that the provider does not owe a duty to the participant." *Roberts*, 884 F.3d at 973 (quoting *Halpern*, 890 P.2d at 566); *see also Jackson Hole Mountain Resort Corp. v. Rohrman*, 150 P.3d 167, 168 (Wyo. 2006) ("If the court can say that, given that evidence, this is an 'inherent risk' and reasonable minds cannot differ about that, then summary judgment is appropriate.").

### b. Inherent Risk

The central question here is whether the plaintiff's injury was the result of an inherent risk of a particular activity. If the injury was caused by an inherent risk, then the recreational provider owes no duty to "eliminate, alter, or control it[,]" and the entry of summary judgment is appropriate. *Rohrman*, 150 P.3d at 168.

The WRSA defines "inherent risk" as "those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity." Wyo. Stat. Ann. § 1-1-122; *see also Cooperman*, 214 F.3d at 1166 (discussing definitions of "characteristic," "intrinsic," and "integral"). But the WRSA—unlike some other states' recreational liability statutes—does not list examples of inherent risks. Rather, "[w]hat an 'inherent risk' means in any given set of circumstances is a variable that the Wyoming Legislature included in the statute by design." *Muller v. Jackson Hole Mountain Resort*, 139 P.3d 1162, 1166 (Wyo. 2006), *opinion after certified question answered sub nom. Muller v. Jackson Hole Mountain Resort Corp.*, 210 F. App'x 792 (10th Cir. 2006).

In order to determine what is an inherent risk under the WRSA, the Wyoming Supreme Court has explained a "reasonableness" inquiry should guide courts. *Rohrman*, 150 P.3d at 170. So, the "central concern . . . is what 'reasonable persons' will view as inherent risks." *Id.* "[I]f reasonable minds

cannot differ as to whether or not a given set of factual circumstances involve an 'inherent risk' of skiing (in this particular instance we are concerned with skiing, or fill in the blank as the case might be), then the protections of the [W]RSA apply, and the litigation of that controversy must come to an end." *Id.*

The Wyoming Supreme Court has pointed to several sources of guidance for determining what reasonable persons would view as inherent risks of an activity. One is, of course, jury deliberations on the particular facts of a case. *See Rohrman*, 150 P.3d at 170. Others are safety experts and experienced skiers.[4] *Id.* But the sources most discussed by the Court in this context are analogous statutes from similarly-situated states. *See Rohrman*, 150 P.3d at 170–72; *Muller*, 139 P.3d at 1166–67. In *Rohrman*, the Court held that reference to analogous statutes—for example, from Colorado, New Mexico, and Utah—is "a meaningful source of guidance in explaining the inherent risks of skiing to any fact finder." *Rohrman*, 150 P.3d at 172.

The explicit citation to these statutes, and the reference to other similar state statutes, is meant to be an expansive guide for courts considering the inherent risk question. For one, the texts of all three analogous state statutes

---

[4] Though the WRSA is not limited to skiing, many of the precedential cases in this context are results of skiing accidents. Any reference in this opinion to skiing, as opposed to other recreational activities, is merely a reflection of this body of precedent and the particular facts of this case.

included in *Rohrman* have *non-exhaustive* lists of inherent risks of skiing.  Each

of the three has broad language that includes, for example, trees and forest debris,

subsurface conditions, and man-made structures.  *See* Colo. Rev. Stat. § 33-44-

103(3.5) (2021); N.M. Stat. § 24-15-10 (2021); Utah Code Ann. § 78B-4-402

(2021).  For another, the court expressly did not constrain itself to these lists,

stating "those statutes are not the exclusive source of guidance and the factual

variations are, in some senses, infinite."  *Rohrman*, 150 P.3d at 172.[5]

---

[5] Though Wyoming's recent Ski Safety Act is not applicable to this case, *see* note 3, the Wyoming legislature, in passing the Act, has since provided a definition of "inherent risks" of skiing in a ski area.  In doing so, Wyoming's law now more closely resembles these analogous state statutes.  The Ski Safety Act provides that

> "Inherent risk" with regard to skiing in a ski area means those dangers or conditions which are part of the sport of skiing, including:
> (A) Changing weather conditions;
> (B) Falling or surface snow conditions, whether natural or man-made, as they exist or change;
> (C) Surface or subsurface conditions including bare spots, forest growth, rocks, *stumps*, streambeds, cliffs, extreme terrain, trees or other natural objects;
> (D) Collisions or impacts with natural objects such as the objects specified in subparagraph (C) of this paragraph including encounters with wildlife;
> (E) Impact with ski lift towers, signs, posts, fences or enclosures, hydrants, water pipes or other man-made structures and their components . . . ;
> (F) Variations in steepness or terrain, whether natural or as a result of ski trail or feature design, or snowmaking or grooming operations such as roads, freestyle terrain, jumps and catwalks or other terrain

(continued...)

In particular, the court's reference to analogous statutes is significant at the summary judgment stage. In situations with novel or contested facts, of course, the question of reasonableness—that is, whether reasonable minds cannot differ over what is an inherent risk—is appropriate for consideration by the fact-finder, not for determination as a matter of law by the court. But when there are no genuine disputes of material fact, the Wyoming Supreme Court has explicitly held that "[u]nder Wyoming's statutory construct, which is much broader than that of Colorado, such items as those included in Colorado's statute may, *as a matter of law*, be inherent risks of the recreational activity of skiing." *Muller*, 139 P.3d at 1167 (emphasis added). "[I]n such cases[,] a trial court may grant a motion to dismiss or a motion for summary judgment based on the [W]RSA." *Id.* In other words, a court may look to the enumerated inherent risks in Colorado's statute to hold that a particular risk is an inherent one as a matter of law.

### 3. *The Risk to Standish*

The district court determined that skiing into an unmarked six-and-a-half-foot-tall tree on an off-piste run—which had been previously altered by Jackson Hole and which was submerged and made invisible by recent, heavy snow

---

[5](...continued)
          modifications; and
          (G) Collisions with other skiers.
Wyo. Stat. Ann. § 1-1-123.2 (2020) (emphasis added).

fall—was an inherent risk of skiing. We agree with both the framing of the inherent risk and the district court's conclusion.

With regard to the risk's framing, we have previously acknowledged "we can not look at the risk in a vacuum." *Cooperman*, 214 F.3d at 1167. Rather, "we must evaluate the risk at the greatest level of specificity permitted by the factual record." *Id.* Here, the operative facts are undisputed. The mountain had received 45 inches of fresh snow in the four days prior to the accident. The accident took place in an off-piste—and therefore ungroomed—area. Standish's injury was caused by a collision with the top of the stump, which was lightly covered with the fresh snow and thus not visible to Standish. The stump had been cut to a height of six-and-a-half feet at some point in the past to mitigate some problem. The district court's inherent-risk framing did not employ any disputed facts and accurately captures the facts of the case. Neither party appears to contest this framing on appeal. We therefore adopt this framing of the risk.

With this specific factual scenario in mind, we conclude that encountering a snow-covered stump in an ungroomed area is an inherent risk of alpine skiing. Everyone familiar with the sight of the intertwining runs of a ski area knows that cutting and otherwise managing trees is necessary for the runs' creation and upkeep. The vast majority of ski-able terrain simply could not exist in the first instance without the ministrations of sawyers and forest managers. And the

-13-

forested setting of ski areas means that trees may sometimes fall or otherwise present hazards. As the risk safety and environmental manager for Jackson Hole indicated in his deposition, trees can be altered or "removed for various reasons." Aple. App. 63. These can include creating more space for skiing in a particular run or glade or mitigating a hazard, such as a "tree blowing over or growing in a particular way that may have been identified to be a hazard." Aple. App. 63. The height at which the tree in this case was cut could have been a function of a high snow-level during winter, or it could have resulted from a decision to cut just below a particular hazard in any season (*i.e.*, the tree broke or became unstable above that height). Whatever the reason, the ability to act to mitigate hazards and cut trees that pose a risk to skiers—or to create new runs or vary the terrain—is essential to effectively managing a ski area.

Moreover, this accident occurred in an off-piste area, in which unmarked obstacles are frequent and inevitable. "[W]e cannot ignore the nature of the run on which he encountered [the stump] and the inherent risks that run presents." *Roberts*, 884 F.3d at 976 (discussing an accident in an off-piste area). And a changing level of the snow—which here was, by chance, just enough to render the stump invisible—is another inherent risk of skiing. Variable snow conditions are intrinsic to the mountainous setting of ski resorts in the American West. *See, e.g.*, *Kopeikin v. Moonlight Basin Mgmt., LLC*, 981 F. Supp. 2d 936, 945

(D. Mont. 2013) ("Skiing presents a multitude of dangers and hazards. Notwithstanding an operator's efforts to tame it, skiing takes place on essentially wild terrain, on a mighty mountain, with fluctuation in weather and snow conditions that constantly change." (internal quotation marks omitted)). Consequently, all reasonable people understand that the combination of encountering the remnant stumps of forest-management practices and of changing snow levels at a ski area is an inherent risk of alpine skiing.

Furthermore, the Wyoming Supreme Court has explicitly held that because the WRSA is a broader statutory scheme than Colorado's analogous law, "such items as those included in Colorado's statute may, *as a matter of law*, be inherent risks of the recreational activity of skiing." *Muller*, 139 P.3d at 1167 (emphasis added). Colorado's statute expressly includes stumps—whether snow-covered or not—as inherent risks. *See* Colo. Rev. Stat. § 33-44-103(3.5) ("'Inherent dangers and risks of skiing' means those dangers or conditions that are part of the sport of skiing, including . . . surface or subsurface conditions such as bare spots, forest growth, rocks, stumps, streambeds, cliffs, extreme terrain, and trees, or other natural objects, and collisions with such natural objects . . . .").[6] And other states

_____

[6] While the other items in this list are all generally natural, the plain meaning of stump indicates a tree that has been cut. *See, e.g.*, *Stump*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/stump (defining "stump" as "the part of a plant and especially a tree remaining attached to the root after the
(continued...)

-15-

include subsurface stumps or forest debris as inherent risks in their analogous statutes, including Utah, *see* Utah Code Ann. § 78B-4-402 (stumps); New Mexico, *see* N.M. Stat. § 24-15-10 ("trees or other forms of forest growth or debris"); Idaho, *see* Idaho Code § 6-1106 (2021) (same); and Montana, *see* Mont. Code Ann. § 23-2-702 (2021) (stumps).[7]

Similarly, Colorado's statute—as well as, for example, Utah's, Idaho's, and Montana's—also includes changing snow conditions and levels as inherent risks. *See* Colo. Rev. Stat. § 33-44-103; Mont. Code Ann. § 23-2-702; Utah Code § 78B-4-402; Idaho Code § 6-1106; *see also Fleury v. IntraWest Winter Park Operations Corp.*, 372 P.3d 349, 351 (Colo. 2016) (holding an in-bounds avalanche qualifies as an inherent risk of skiing because it is a "changing condition" of snow). The depth of the snow in this case is as integral to the accident as the height of the stump. Any less snow, and the stump would have

[6](...continued)
trunk is cut"); *Stump*, *Oxford English Dictionary*, https://www.oed.com/view/Entry/192144 (defining "stump" as "[t]he portion of the trunk of a felled tree that remains fixed in the ground; also, a standing tree-trunk from which the upper part and the branches have been cut or broken off"). And the remainder of Colorado's inherent-risks list includes man-made items, including "impact with lift towers, signs, posts, fences or enclosures, hydrants, water pipes, or other man-made structures and their components," and "terrain modifications." Colo. Rev. Stat. § 33-44-103(3.5).

[7] So, too, does Wyoming's new Ski Safety Act, which went into effect about six months after Standish's accident. *See* Wyo. Stat. Ann. § 1-1-123.2 (including "stumps" as inherent risks of skiing).

been visible; any more, and Standish would have passed over the top unharmed. Given that there are no genuine disputes of material facts in this case, holding that a snow-covered stump in an off-piste area is an inherent risk of alpine skiing comports with Wyoming Supreme Court precedent.

This conclusion aligns with both our precedent and public policy. In *Cooperman*, a Tenth Circuit panel considered whether a slipping saddle that was loosely cinched by the recreational provider is an inherent risk of horseback riding. *See Cooperman*, 214 F.3d at 1168. Cinching a saddle, explained the panel, "is done by hand, and not with scientific precision," so "a provider must make a judgment call as to how tight or loose to cinch the saddle." *Id.* "This imprecision in the cinching of the saddle is characteristic or typical of and therefore inherent in the sport of horseback riding." *Id.* (internal quotation marks omitted). The same is true for managing forests. Ski-area managers must make judgment calls about whether and how to cut a tree that has become a hazard. In winter, the height at which a tree is cut is as imprecise and judgment-based as cinching a saddle: it can be cut too tall or too short, and the risk of its being covered lightly with the next snow fall—or being exposed by snow melt—is characteristic of ever-changing mountain conditions at ski areas. So, too, in the summer: a tree could be cut at any height to mitigate a hazard, and a forest manager could decide to leave the stump remnant for a variety of reasons (*e.g.*,

impossibility of removal based on terrain, concerns about slope destabilization or damage, or ecological concerns about surrounding flora or fauna).  Forest management, just as the saddle-cinching in *Cooperman*, is based on best practices—not exact practices—and the resulting risks are inherent to skiing in a forested ski area.

In a more recent case, this court held that encountering subsurface boulders—and the gaps between them—in an off-piste ski area in changing snow conditions is an inherent risk of skiing.  *See Roberts*, 884 F.3d at 976.  The panel in *Roberts* noted that a "critical distinction has emerged in the case law between a provider's failure to control inherent risks (which is no longer actionable)[] and actions that affirmatively enhance existing risks (which remain actionable)." *Id.* at 975.  Because subsurface boulders are an inherent risk of skiing in an off-piste area, and because Jackson Hole had done nothing to affirmatively enhance the existing risk of the boulders, the panel reasoned, the WRSA limited Jackson Hole's liability, and summary judgment was appropriate.  *See id.* at 977.

To reach this conclusion, the *Roberts* panel relied on *Creel* and *Dunbar*. *See id.* at 975–76.  The outcomes in both *Creel* and *Dunbar* rest on the actions of the employees or agents of the recreational provider affirmatively enhancing *existing* risks.  In *Creel*, the Wyoming Supreme Court held that the danger of being struck with a golf ball is an inherent risk of attending a golf

tournament—but the employee who encouraged the golfer to hit despite the golfer's concern about spectators in the way affirmatively enhanced the existing risk of stray golf balls. *See Creel*, 287 P.3d at 739. In *Dunbar*, the Tenth Circuit panel concluded encountering a half-pipe in a terrain park is an inherent risk of skiing—but the "delphic statements" of the employee on how to safely exit the terrain park affirmatively enhanced the existing risks posed by the terrain park features. *Dunbar v. Jackson Hole Mountain Resort Corp.*, 392 F.3d 1145, 1153 (10th Cir. 2004).

Not so here. Had a Jackson Hole employee represented to Standish that this particular run was groomed or free of obstacles, Jackson Hole might have created a jury question that the resort somehow enhanced the risk of an accident. *See, e.g.*, *Roberts*, 884 F.3d at 976 (The plaintiff "was not directed to [the area where the accident occurred] by an employee offering 'delphic statements' about its safety; in fact advanced skiers in search of fresh untracked and unconsolidated powder are attracted to off-piste terrain . . . *because* it is ungroomed, untamed, and provided the types of natural obstacles that distinguish such runs from those frequented by less talented skiers." (quoting *Dunbar*, 392 F.3d at 1153; emphasis in original)).

But there are no facts in this case to suggest anything of the sort. "[T]here is a difference between the consequences of conduct chosen by [the skier], and

-19-

risks that are inherent to that choice." *Dunbar*, 392 F.3d at 1151. Standish knew

that unmarked obstacles could and would exist in this off-piste area, and he chose

to proceed down this more-advanced run. Nor did Standish present any evidence

that cutting the tree at *this* particular height affirmatively enhanced the risk or

took it "outside the realm of inherent risk." *Creel*, 287 P.3d at 737. What made

the stump's height hazardous was the snow level on January 11—and changing

snow levels are undoubtedly an inherent risk of mountain recreation.

Consequently, the district court properly found that Jackson Hole did not enhance

the already-existing risk of the stump.

The outcome in *Roberts* further supports our decision here. In that case,

Roberts's expert—who had concluded that subsurface boulders were *not* an

inherent risk of off-piste skiing—"put the cart before the horse" by faulting

Jackson Hole for not placing warning signs above the area. *Roberts*, 884 F.3d at

976–77. But this targeted the element of *breach* without establishing the

existence of a *duty* in the first place. *Id.* at 977. Conclusory statements that the

boulders that had caused Roberts's injuries were not inherent risks of skiing were

insufficient to preclude summary judgment. *Id.*

The same is true of the expert testimony Standish presents. As the district

court noted, Standish's expert addressed how Jackson Hole *breached* the duty it

supposedly owed Standish by not removing the remnant stump. But a snow-

covered stump is itself an inherent risk of alpine skiing, and the expert's testimony does not address what action by Jackson Hole takes the stump "outside the realm of inherent risk." *Creel*, 287 P.3d at 737. The expert's claim that "[t]he act of removing the top part of the tree was an affirmative act by the Resort which created the risk encountered by Mr. Standish" is unavailing. Aplt. App. 33. If that were true, then every tree cut by Jackson Hole's forest managers would present a non-inherent risk to skiing—depending on the snow level on a particular day. And the expert's claim that Jackson Hole's "failure to finish the job . . . substantially enhanced the risk created by the Resort" improperly imposes a duty on Jackson Hole to remove completely the stumps made by its forest management. Neither the Wyoming legislature nor any court has imposed such a duty on ski areas. And given the Wyoming Supreme Court's express embrace of the inherent risks in Colorado's statute, including stumps, the expert testimony fails to preclude summary judgment.[8]

---

[8] Standish's argument that the expert represented the views of at least "one reasonable person" and thus precluded summary judgment, is similarly unavailing. The reasonableness inquiry to determine whether something is an inherent risk of an activity requires, of course, consideration of the inherent risk itself. But, again, Standish's expert does not discuss or espouse any non-conclusory opinion on the inherent risk of a subsurface stump in an off-piste area; rather, his conclusion is based on Jackson Hole's failure to remove it. This merely *assumes* that such a stump is not an inherent risk. Further, the mere existence of a contrary expert opinion—particularly a conclusory expert opinion—does not preclude summary judgment. *See Roberts*, 884 F.3d at 977.

This conclusion also aligns with public policy. To hold that Jackson Hole has a duty to cut trees to a particular level or to remove stumps entirely would disincentivize recreational managers from attempting to mitigate hazards for their guests. If a fallen tree in an off-piste area is an inherent hazard of skiing, and cutting it off below the break creates a non-inherent risk, a ski area manager might decide to simply leave the fallen tree so as not to potentially incur liability. The WRSA is meant to limit the liability of recreational providers so that they can, in their judgment, both manage and offer sometimes-risky recreational opportunities.

Moreover, the standard that would arise from the opposite conclusion here would be untenable. Suppose a tree falls in an off-piste ski area during the winter and needs to be cut. The tree is cut to just above the current snow level, 70 inches. For the next week, the snow melts, leaving about 10 inches of the stump exposed and clearly visible to skiers. But then 11 inches of fresh snow falls, just covering the exposed stump. To conclude that the ski area is then liable for a skier's collision with that stump would expose the ski area to liability the WRSA is clearly meant to limit. In other words, to hold that the WRSA does not preclude liability in this case would impose a duty on ski areas to never allow a tree stump be the same height as the current level of the snow—*even in* off-piste areas. We decline to reach such a conclusion.

* * *

Standish's accident was the result of an unfortunate confluence of a stump, an ungroomed run, and the spectacular snow levels of the previous days. The combination of these factors is an inherent risk of skiing, a sport as thrilling as it can be risky. And the WRSA reflects this by limiting the duty owed by an entity offering access to such a sport. Accordingly, we affirm the district court's grant of summary judgment in favor of Jackson Hole on the basis of the WRSA.

## B. Consideration of Inadmissible Facts

Standish also argues that, in evaluating the motion for summary judgment, the district court improperly considered facts that would be inadmissible before a jury. His argument is based on the district court's discussion of the factual context of analogous and precedential cases—including, for example, *Creel*, *Dunbar*, *Cooperman*, and *Roberts*. *See* Aplt. Br. at 12–14.

While we review a district court's evidentiary rulings for abuse of discretion, *see, e.g.*, *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998), we review a district court's findings of law and entry of summary judgment de novo. *See Roberts*, 884 F.3d at 971. It is true that a district court may consider only admissible *evidence* from a record in ruling on a motion for summary judgment. *See Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1209 (10th Cir. 2010) ("[I]t is well settled in this circuit that we can consider only

-23-

admissible evidence in reviewing an order granting summary judgment." (quoting *Wright-Simmons*, 155 F.3d at 1268)).

But in discussing these cases, the district court here was not making an evidentiary ruling about whether the facts of cases like *Creel* and *Cooperman* would be presented to a jury at trial. Rather, it was making a determination of law. In discussing the facts of these analogous cases, the district court was engaging in classic legal analysis: comparing the facts of Standish's case with the factual context of other inherent-risk cases under the WRSA. *See, e.g.*, Aplt. App. 54 (discussing the facts of *Roberts* to evaluate Standish's claims); Aplt. App. 58 (discussing *Dunbar* to determine Standish's claim of risk-creation).

To have erred here, the district court would have had to consider facts *about Standish's case* that were not in the record or would have been otherwise inadmissible before a jury. The district court did not do so, and we reject Standish's argument.

## III. Conclusion

Thomas Standish's injuries from his accident were severe and painful. This case provides a somber reminder of skiing's risks to those who enjoy the sport. But Wyoming law does not provide recourse against Jackson Hole for Standish's accident. We therefore AFFIRM the district court's entry of summary judgment.